OF

# THE STATE OF IOWA

AT

## DES MOINES, MAY TERM, A. D. 1900.

AND IN THE FIFTY-FOURTH YEAR OF THE STATE.

---

STATE OF IOWA v. JAMES CUNNINGHAM, Appellant.

**Murder of Bastard:** INDICTMENT: *Failure of proof and variance.* An indictment charged the murder of one James Cunningham, Hepp, omitting all other description of deceased. Defendant was convicted of the murder of an illegitimate born to James Cunningham and Ida Hepp. A motion to direct a verdict was overruled, one of the grounds being that there was no evidence that James Cunningham Hepp ever existed. *Held:*

a. While it is true that a bastard bears the name of neither parent and the grand jury had no authority to give it a name combining that of its parents, yet the case is governed by Code, 5286, which provides that where certain offenses are "described in all other respects with sufficient certainty to identify the act, an erroneous allegation of the name of the person injured is not material."

(233)

b.  Were the question open, some of the members of the court would construe this section to be inapplicable to cases where, like here, no description beyond the name given in the indictment is attempted of deceased.

c.  But the rule established is, that if an offense is charged in the indictment and from facts in evidence, the court is satisfied defendant was not misled, this warrants the conclusion that the act intended to be charged was sufficiently described or indicated.

d.  Where the one injured is described by name alone, extrinsic facts may be considered in order to determine whether the act charged was so specifically pointed out as not to mislead the defendant.

e.  Facts outside of the indictment may be considered in determining whether defendant understood the specific charge intended to be made.

f.  Defendant was not misled by the misnomer.

g.  Under the circumstances it was not error for the court to instruct that the intention of the indictment was to charge the killing of the infant child of Ida Hepp, instead of. leaving it to the jury whether the nameless infant was the person whom defendant was charged with killing.

**Murder:** EVIDENCE: *Review of verdict.* Defendant, the father of an illegitimate, accompanied its mother to a place where they were strangers and where she gave birth to the child. On returning home with the child, about two weeks thereafter, early in March, they wrapped it in a shawl, and on the way they went from one depot to another at a certain place to make a transfer. Defendant procured a buggy, and drove by an unfrequented road to the other depot, where the mother alighted, leaving the child with defendant, and it was not seen alive thereafter. He then drove towards the fair grounds, and a witness saw the same team there about the same time. The infant's dead body was found in a good state of preservation two weeks after, near the fair grounds and identified. It lay on the ground, and had wounds on its person sufficient to have caused death. Defendant had time to drive to where it was found, and return and take the train with its mother, which he did. When he returned the team he took from his buggy a shawl, and, a short time after, an infant's robe was found in the manger in front of the horses. Up to leaving the depot with the child, defendant denied none of the facts established, but claimed to have driven back into town and delivered it to a woman from a distant city, under a pre-arrangement with her. But this woman was not seen by any one.

Though the testimony was conflicting, there was expert evidence that the body could, without decomposing, have lain where it did from when defendant was last seen with it until it was found. There was other evidence to show that it must have been alive later than the day in question, but it was inconclusive and doubtful. There was also evidence of an admission of guilt by defendant. *Held*, to amply support a conviction.

**Harmless Error:** Defendant claimed that he could not have committed a murder as early as charged because the body would in that event have shown greater decay when found. Under these circumstances, it did not harm defendant to let the State show that a doctor produced by it, and who testified on the progress of decomposition, had obtained his experience with bodies treated with a preserving compound.

Same. Assuming it to be charged by the court that if the jury found murder was not done on the day charged in the indictment, there must be substantive evidence that the killing was done on a different day, every circumstance pointing to motive and intent may be considered with relation to any particular date on which an alleged crime may have been committed and evidence of circumstances showing motive, intent, and opportunity to commit infanticide, and of an admission of guilt, warrants a conviction, though the jury may determine that the killing was not done on the day charged.

Included offenses: *Killing of infant.* In a prosecution for murder in the first degree, where no one witnessed the killing, the victim being an infant, the court properly submitted the included offenses of murder in the second degree and manslaughter, warranted under the facts which might have fairly been found, but no offense lower than manslaughter could have been committed.

Instruction on good character. In a prosecution for infanticide an instruction that, if the jury found defendant guilty, evidence as to his humane and kindly disposition towards children constitutes an ingredient to be considered in passing on the grade of his offense, without reference to the apparently conclusive or inconclusive character of the other evidence, and that the jury were to consider this evidence throughout their deliberations, and give it such weight as they thought it justly entitled to, was proper, and did not limit the jury in their consideration of such evidence.

*Appeal from Audubon District Court.*—HON. WALTER I. SMITH, Judge.

TUESDAY, MAY 8, 1900.

THE indictment charges murder in the first degree. From a judgment of conviction entered on a verdict of guilty, defendant appeals.—*Affirmed.*

*B. I. Salinger* and *J. H. Mosier* for appellant.

*Milton Remley,* Attorney General, and *Chas. A. Van Vleck,* Assistant Attorney General, for the State.

WATERMAN, J.—Defendant was tried for the killing of an illegitimate male infant born to one Ida Hepp, and begotten by him. The child was twelve days old on the alleged date of the killing. It had no name until the grand jury saw fit to give it one made up of the names of its parents. The indictment is in two counts, the same in form. The first charges the killing to have been done with a blunt instrument; the other, with the hands and feet of defendant. As a material question presented relates to the form of the indictment, we set out the first count: "The said James Cunningham and Arthur Palmer on the 5th day of March, A. D. 1898, in the county of Audubon and state of Iowa, as aforesaid, upon the body of one James Cunningham Hepp, then and there being, willfully, feloniously, deliberately, premeditatedly, and of their malice aforethought, and with the specific intent to kill, did commit an assault with a deadly weapon, being a blunt instrument, a more particular description of which is to this grand jury unknown, and then and there held in the hand of said James Cunningham, and then and there the said James Cunningham did, with the specific intent to kill and murder as aforesaid the said James Cunningham Hepp, willfully, feloniously, premeditatedly, and of his malice

aforethought, strike the said James Cunningham Hepp in and upon the body of him, the said James Cunningham Hepp, with said dangerous and deadly weapon, thereby willfully, feloniously, deliberately, premediatedly, and of his malice aforethought, inflicting in and upon the body and head of the said James Cunningham Hepp mortal wounds, of which mortal wounds inflicted as aforesaid the said James Cunningham Hepp, in the county of Audubon and state of Iowa, then and there did die. And the grand jury aforesaid upon their oaths do say, present, and find that the said James Cunningham and Arthur Palmer then and there, in the manner and form aforesaid, willfully, feloniously, premeditatedly, and of their malice aforethought, did kill and murder the said James Cunningham Hepp, contrary to the statute in such case made and provided, and against the peace and dignity of the state of Iowa." At the close of the evidence for the state a directed verdict of not guilty was asked on the ground that it was not shown that James Cunningham Hepp had ever lived or been killed. The same question was also presented by motion after verdict. We have, then, to consider the validity of this indictment as a support for the prosecution of defendant for killing a nameless infant. A bastard child has no name until it has acquired one by reputation or baptism. See cases collected in 3 Am. & Eng. Enc. Law, 890. At common law, in a proceeding like the one we have here, a conviction could not have been had on an indictment such as this. A misnomer of the party injured was fatal. Roscoe Criminal Evidence, 131; Archbold Criminal Pleading, 31. We turn, then, to the statute, to see what change has been effected in the common-law rule. Section 5286 of the Code is as follows: "When an offense involves the commission of or an attempt to commit an injury to person or property, and is described in all other respects with sufficient certainty to identify the act, an erroneous allegation of the name of the person injured or at-

tempted to be injured is not material." Were the question an open one, some of us would construe this section to mean that an error in the name of the party injured is not material, when such person is otherwise described or pointed out in the indictment. There was no other description here made or attempted of the person killed, than by the name given. But the question is not a new one in this state. Discussion has been foreclosed by decisions of this court. We understand the rule to be that if an offense is charged in the indictment, and from facts in evidence the court is satisfied that defendant was not misled, this is enough to warrant the conclusion that the act intended to be charged was sufficiently described or indicated. We need not review all the cases in which this court has undertaken to construe section 5286. In some of them the question of its meaning was not involved, as in *State v. Emeigh,* 18 Iowa, 122, where it appears there was no misnomer, and *State v. Ean,* 90 Iowa, 534, where the allegation in the indictment was that the name of the woman with whom defendant was charged to have committed adultery was to the grand jury unknown. In some other cases the language of the indictment is not reported, and we are unable to say whether the injured person was identified other than by name. See *State v. Windahl,* 95 Iowa, 471; *State v. Flynn,* 42 Iowa, 164; *State v. Carnagy,* 106 Iowa, 483. In still another class of cases the facts stated, other than the name, tend to point out the injured person,—as, for instance, in *State v. Hall,* 97 Iowa, 400, the indictment charges a larceny of property in the possession of the receivers of the Union Pacific Railway; naming one of them as Oliver W. Mink, whose true name was Oliver W. Ames. It will be seen at a glance that the injured person is also described as one of the receivers of the railway. See, also, *State v. Semotan,* 85 Iowa, 57; *State v. Franks,* 64 Iowa, 39; *State v. Porter,* 97 Iowa, 450; *State v. Cunningham,* 21 Iowa, 433. *State v. Windahl, supra,* may also be cited under this

head for there was evidence that the person injured was known to some people by the name given in the indictment. But we find other cases in which the indictment, in terms, does not describe the injured party save by name, and where it is held that extrinsic facts may be considered in order to determine whether the act charged was so specifically pointed out as not to mislead the defendant. When in the trial court this fact is so determined, we pass on appeal upon that as upon any other fact. In *State v. Crawford,* 66 Iowa, 318, the indictment charged an assault with intent to kill one Jesse Cameron. The true name of the party upon whom the assault was made was Jesse Walker Cannon. Defendant moved in arrest of judgment on the ground of this misnomer. After quoting the section in question, this court, speaking through Rothrock, J., said: "This provision of the statute would, of itself, seem to authorize the overruling of the motion in arrest of judgment upon this ground. There is no showing that the defendant was in any way misled by the misnomer. On the contrary, the record shows quite conclusively that the defendant was not in any way prejudiced by the mistake in the indictment. The facts are that he shot at Jesse Cannon with a revolver, and wounded him in the arm and back; was arrested, confined in jail, and had a preliminary examination; and it does not appear that he shot at any other person at or about the time charged in the indictment." In the case at bar, defedant had been arrested, had a preliminary examination, and knew that he was charged with the killing of this infant child. In *State v. Carr,* 43 Iowa, 418, the charge was the robbery of one John Shattick by taking of the property of "John Shattick from the person and against the will of said John Kopek." As matter of fact, the name of the person robbed was neither Shattick nor Kopek, but Shoppick. The court instructed the jury that the mistake in the name was immaterial, unless they

should find that defendants were misled thereby. This instruction was objected to, and we approved it. This is a direct holding that facts outside the indictment may be considered in determining whether the defendant understood the specific charge intended to be made. We are convinced that the defendant here was in no way misled by the misnomer, and he cannot, therefore, be permitted to take advantage of it.

II. It is strenuously claimed that the evidence does not support the verdict. The testimony established or tended to establish the following facts: Defendant and Ida Hepp reside in the northern part of Audubon county. They were unmarried, and had been keeping company together. As a result of illicit intercourse had, she became pregnant, and, being near her confinement in February, 1898, both she and defendant determined that she should seek some place to give birth to her child, where neither of them was known. On February 19th defendant appeared at a hotel in Atlantic, Cass county, and engaged lodging and board for himself and Ida Hepp; representing her as his wife. He told the landlord he was on his way with his wife to Nebraska, and he thought she was going to be sick. They were given accommodations, and on the twenty-first the child (a boy) was born. Cunningham did not register, but tried to keep his identity secret. The suspicion of the landlord was finally roused. He asked Cunningham to register, and, in the talk that ensued, the latter told his story. He said they belonged to respectable families, and the girl's shame was almost killing her; that he had spent forty-seven dollars in trying to get rid of the child. The child, when born, had a harelip, and an unnatural condition of the genital organs made circumcision necessary. This was performed. On March 5th Cunningham and the girl left on the train of the Rock Island Railway for Audubon, carrying the child wrapped in a shawl which he had purchased for the purpose. They reached Audubon at 8:45

A. M., intending to take a train on the Northwestern Railway for their homes, which left that morning at 10 A. M. On arriving at Audubon, Cunningham left the girl and child in the Rock Island Depot, went up into the town, procured a team and top buggy, returned to the depot, got Miss Hepp and the baby, and drove by an unfrequented road to the Northwestern Depot, where the girl alighted, leaving the baby with Cunningham, who drove away. Cunningham, after leaving the depot, went towards the fair grounds. A witness saw the team driven by him on the fair grounds early in March, but could not fix the precise date. The dead body of the infant, which was identified by the peculiarities we have mentioned, was found on the nineteenth day of March following, about twenty rods north of the fair grounds, lying on the surface of the ground, partially covered with weeds. There were contused wounds upon its person that were sufficient to have caused death. Cunningham had time to drive to the place where the body was found, and return to the depot and take the train for the north with Miss Hepp, as he in fact did. The child was not seen after Cunningham took it away in the buggy until it was found dead. When Cunningham returned the team to the stable, he took from the buggy a shawl, and, a short time after, an infant's robe was found in the manger in front of the horses. To present as clearly as possible the points sought to be made by the defense, we turn now to the testimony of Cunningham: Save the statement as to his attempt to get rid of the infant, he denies nothing of the facts set out up to the time of leaving the Northwestern Depot in Audubon with it. He claims to have driven back into town and given the child to a woman, who was to care for it. He says he first met this woman, a stranger, on February 3d, in the streets of Manning. She accosted him, and asked that he get her a pint of whiskey; told him that she was from Omaha. They were together about an hour, and he made arrangements for

her to take the child when it should be born. He had an
understanding with her, reached through subsequent corre-
spondence, to meet him in Audubon on March 5th and take
the child. He says he saw her when he went to get the
team, and arranged to deliver the child on the street, and
that this was done. It is remarkable, to say the least, that
the child should be taken from the shawl in which it was
wrapped when given to this woman, and more remarkable
still that its dress should have been retained by Cunningham,
and left in the livery barn with the horses. He claims to
have paid the woman forty dollars for taking the child. How
long she was to keep it, or what she was to do with it, other
than generally to care for it, was not mentioned between
them. The woman was in no house in Audubon; seen by
no person there save Cunningham. That the jury had good
reason to regard her as a mythical personage is clear, with-
out further argument. But it is said that Cunningham is
corroborated to this extent: That it is made clear that the
child was not killed on the fifth day of March, and that de-
fendant established an alibi as to the time thereafter up to
the date when the body was found. We may dispose of this
alibi, by saying that the evidence was in conflict, and the
jury might properly have found against it. We return to a
consideration of the question whether the evidence can
sustain a finding that the child was killed on March 5th.
Its body was found, as we have said, in a good state of pres-
ervation, on March 19th. The temperature of the atmos-
phere and condition of weather during this interval were
shown, and, taking these facts into consideration, together
with the exposure of the body, and its condition when found,
a number of physicians testified on the part of defendant
that the remains would have decomposed in much less than
two weeks. They differ greatly in the time they fix when
decomposition would set in,—twenty-four hours to five days,
—but they agree that it could not have lain there two weeks.

An expert introduced by the state.testified that, under the conditions that existed, the body might have been exposed from the fifth to the nineteenth without decomposing. This witness was a physician of extended experience, had conducted a dissecting room in a large city for seventeen years, and had special facilities for noting the decomposition of human dead bodies. The facts, too, would seem to corroborate this witness. Under the body of the infant, when found, was a layer of ice, which would help to keep the flesh from decay. The jury had a right to accept the testimony of this witness, and base their finding thereon. But it is said that the umbilical cord was healed when the body was found.; that it does not heal perfectly in less than twenty-five days, and the operation of healing ceases at death. The testimony does not show that the navel cord of this child was perfectly healed when found. Dr. Childs, who made the post mortem, says it "was healed so far as I noticed." That is all the testimony on the subject. If the child died on March 5th, it was then thirteen days old, and in that time the cord would heal to a considerable extent. Still another reason given why the death could not have occurred on March 5th is that rigor mortis set in after the body was discovered, and this could not have taken place so long after death. Dr. Childs testified that when the body was found it was limp and flexible. The child was buried the day it was found,—Saturday,—and exhumed the following Monday. Dr. Childs says that when the corpse was taken up, stiffness had set in. He does not say what this stiffness was, or what caused it. We are not able to say it was rigor mortis. When we add to the facts stated the additional one that there is evidence of an admission by defendant that he killed the child, it will appear there is ample support in the testimony for the verdict.

III.   The court instructed the jury that the intention was to charge in the indictment the killing of the infant;

child of Ida Hepp. Objection is made that the court had no right to assume this fact. It may well be that it was for the jury to say whether the nameless infant was the person whom defendant was charged with killing, but there was no conflict here, and no room for doubt. The evidence was irresistible that this was the fact. No prejudice resulted to defendant from the instruction. It is not prejudicial error for the court to assume a fact about which there is no dispute. *State v. Huff,* 76 Iowa, 203. If the case of *Mead v. State,* 26 Ohio St. 505, is meant to announce a different rule, it is not in accord with the weight of modern authority. See *People v. Gallagher,* 75 Mich. 512 (42 N. W. Rep. 1063); *Bynon v. State,* 117 Ala. 80 (23 South. Rep. 640); *Wiborg v. U. S.,* 163 U. S. 632 (16 Sup. Ct. Rep. 1127, 41 L. Ed. 289); *People v. Phillips,* 70 Cal. 61 (11 Pac. Rep. 493); *Hanrahan v. People,* 91 Ill. 142; *Hawkins v. State,* 136 Ind. 630 (36 N. E. Rep. 419). Indeed, we think our holding that the indictment is sufficient settles this point against defendant. The ninth paragraph of the charge is also challenged. It is quite lengthy. We shall not set it out. It is sufficient to say that we have carefully examined it in view of the criticisms made, and discover no error. It is very fully and carefully drawn, and states accurately the effect that should be given such circumstances as tend to show that defendant killed the child on March 5th, if the jury find from all the evidence that it was not killed until a later date, and also the necessity for there being some evidence in addition to such circumstances, in order to find the killing to have been done after March 5th. It is said there is no evidence, independent of that which points to the killing on March 5th, which goes to show that defendant committed the crime thereafter, and that this instruction made it necessary that there should be such other evidence, in order to convict. Every circumstance pointing to motive and intent could be considered with relation to any particular date.

These, with the evidence of opportunity at a later time, and the admission made by defendant, would warrant a finding of guilty, even if the jury determined that the killing was not done on the fifth day of March.

IV.   Exception is also taken to the action of the court in submitting to the jury the included offenses of murder in the second degree and manslaughter.   The verdict here was of murder in the second degree.   Where the evidence establishes that a defendant is either guilty of the crime charged, or not guilty, the trial court need not submit included offenses.   *State v. Caten*, 100 Iowa, 501. But we cannot say that is the case here.   The act of killing was witnessed by no person.   Whether it was premeditated and deliberate, or done in a moment of desperation or passion, is a matter of inference only.   In such a case we think it is wise to do as the trial court did here, submit every grade of offense which would be warranted under the facts which might fairly be found.

If any crime was perpetrated, this child was feloniously killed.   Therefore there could be no offense below manslaughter committed.

V.   The following instruction given is likewise excepted to by defendant: "Defendant has introduced evidence as to his character as a man of humane and kindly disposition towards children.   In passing on the question of his guilt or innocence, and, if you find him guilty, in passing on the grade of his offense, this evidence as to his character constitutes an ingredient to be considered by you, without reference to the apparently conclusive or inconclusive character of the other evidence; and it is for you to consider this evidence throughout your deliberations on the facts of the case, and give it such weight as you think it justly entitled to."   Defendant seems to think this instruction limited the jury in their consideration of the character evidence.   We do not see any warrant for such a construction.   The law as stated is in harmony

with the decisions of this court. *State v. Gustafson,* 50 Iowa, 194.

VI. We have examined carefully the objections made to the testimony, and upon which claims of error are predicated, and conclude that no prejudicial ruling was made. As an instance of the character of these matters, Dr. Childs, a witness for the state, testified to experience at the dissecting table, and as to the length of time corpses were kept for the purpose of dissection. He was asked by the state whether a preserving fluid was not injected into such bodies, that tended to keep them from decomposing. This was objected to by defendant. The answer was that such a fluid was used. Manifestly, this fact was in defendant's favor, and, if erroneously admitted, could have caused no prejudice. We shall let the general statement made dispose of the other matters of this kind.

The motion to tax to the state the cost of the additional abstract filed at its instance will be overruled.—AFFIRMED.