THE STATE OF IOWA v. THEODORE BERTOCH, Appellant.

112 195
124 212
112 195
d129 234
112 195
135 724

**Murder by Poison:** WILL NOT SUSTAIN MURDER IN SECOND DEGREE CONVICTION. Where an indictment charged defendant with poisoning deceased, a conviction of murder in the second degree cannot be sustained, since under Code, section 4728, making all murders perpetrated by means of poison murder in the first degree, defendant was either guilty of murder in the first degree or not guilty at all.

CONVICTION FOR MURDER: *Evidence insufficient.* Defendant lived at deceased's house, and had sustained improper relations with deceased's wife. Defendant and deceased had often quarreled, and some considerable time prior to the latter's death defendant had brought a box of rat poison to the house saying that he wanted to poison rats with it. Deceased died of arsenic poisoning. One witness testified that she had seen defendant and deceased's wife putting up blackberries, which they put into jars and carried into the cellar. Deceased's son testified to having been directed by his mother to bring some fruit from the cellar, and that he brought a glass which his mother told him had poison in it, and which he later returned to the cellar at her direction. Particles of arsenic were subsequently found on the sides and bottom of a jar taken from deceased's house, but there was no evidence that this jar was like any of those into which the blackberries had been put, nor that it was like any of those brought from the cellar. There was no evidence that deceased ever partook of its contents, nor that defendant had anything to do with putting the poison into the fruit or giving it to deceased. *Held,* not sufficient to sustain a conviction for the murder of the deceased.

*Appeal from Clinton District Court.*—HON. P. B. WOLFE, Judge.

TUESDAY, OCTOBER 16, 1900.

THE indictment in this case charges, in substance, that on the thirteenth day of September, 1897, the defendant, Theodore Bertoch, and one Ernestine Bertoch, who is jointly indicted with the defendant now on trial, willfully, unlaw-

fully, deliberately, feloniously, premeditatly, and of malice aforethought, and with the specific intent to take the life of a certain one Charles Selhusen, did mix and mingle a certain deadly poison, called "arsenic," in certain berries, which had been and were prepared for the use of, and to be eaten and drunk by him, the said Charles Selhusen; that the said Theodore Bertoch and Ernestine Bertoch knew that said arsenic was a deadly poison, and that the said berries with which said deadly poison was mixed and mingled were then and there provided for the use of, and to be eaten and drunk by him, the said Charles Selhusen, with the intent on the part of the said defendants to take the life of the said Charles Selhusen, and from the eating and drinking of which the said Charles Selhusen died on the seventeenth day of September, 1897. The second count of this indictment is, in substance, the same as the first, with the exception that it says that the death of Charles Selhusen was caused by poison prepared and given to him by the defendants, and that said poison was arsenic and certain deadly poison to the grand jury unknown, and that said poison was given to him with the intent on the part of the said defendants to take the life of the said Selhusen, and that from the effects of the poison so administered the said Charles Selhusen died on the seventeenth day of September, 1897. The defendant Theodore Bertoch pleaded not guilty, was separately tried, and a verdict as follows returned against him: "We, the jury, find the defendant Theodore Bertoch guilty of murder in the second degree." Judgment of imprisonment in the penitentiary "for the term of his natural life" was rendered on the verdict. Defendant appeals.— *Reversed.*

*F. W. Ellis* and *L. A. Ellis* for appellant.

*Milton Remley,* Attorney General; *Charles A. Van Vleck,* Assistant Attorney General; *J. S. Darling,* and *C. H. George* for the state.

GIVEN, J.—I.   Our opinion announced on the former submission of this case (89 N. W. Rep. 378)* contained the following:

"The court gave the following, among other instructions: '(1) The indictment in this case charges that the life of one Charles Selhusen was taken by having poison administered to him by the defendant, and that said poison was so given to the said Selhusen with the intent to take his life. Under the charge in this indictment, the defendant may be convicted, the evidence warranting, of either one of the following grades of homicide: Murder in the first degree, murder in the second degree.' '(8) If you have any reasonable doubt of the degree of the murder of which the defendant is guilty, if guilty at all, you should only convict of such offense as you have no reasonable doubt of his guilt.' The jury was further instructed as to the elements of murder in the first and in the second degrees, and was told that the distinctive difference is that in the second degree it need not be shown that the murder was with deliberate, premeditated purpose to kill, while in the first degree deliberate, premeditated intent to take life must be shown. The jury was also instructed: 'If you find the defendant not guilty of murder in the first degree, you will proceed to determine whether he is guilty of murder in the second degree.' Of these instructions the defendant complains, and insists that under the indictment he cannot be convicted of murder in the second degree, that there is no evidence to sustain the finding of guilt in the second degree, and that under the evidence he is either guilty in the first degree or not guilty. It is claimed on behalf of the state that under the statute and this indictment a conviction can be had in the second degree, that under the statute the jury was required to determine the degree, and that the instructions complained of were not prejudicial to the defendant.

"The first question to be considered is whether, under a charge of murder—that is, of killing a human being

* This is not officially reported.— REPORTER.

with malice aforethought,—perpetrated by means of poison, the accused may be convicted of murder in the second degree; or, in other words, whether there are degrees in murder perpetrated by means of poison. Our statute provides as follows:

" 'Sec. 4727. Murder. Whoever kills any human being with malice aforethought, either express or implied, is guilty of murder.

" 'Sec. 4728. First Degree. All murder which is perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem or burglary, is murder in the first degree, and shall be punished with death, or imprisonment for life at hard labor in the penitentiary, as determined by the jury, or by the court if the defendant pleads guilty.

" 'Sec. 4729. Second Degree. Whoever commits murder otherwise than as set forth in the preceding section is guilty of murder of the second degree, and shall be punished by imprisonment in the penitentiary for life, or for a term of not less than ten years.'

"The only authority cited that sustains the claim that in this case a conviction could be had in the second degree is *State v. Dowd*, 19 Conn. 388, wherein it is held, under statutes similar to ours, that, on an indictment for murder perpetrated by means of poison, the jury might find the accused guilty of murder in the second degree: In that case the court said: 'In most of the cases mentioned in the statute as constituting the crime of murder in the first degree, the lesser crime is manifestly included. Thus, if the charge were that the murder was committed by the accused while lying in wait, the jury might find that it was not so committed, and convict him only of the lesser offense. So, if it were averred that the act was done by him while attempting to commit the crime of arson or rape, the jury

might find that part of the charge untrue, and still convict the prisoner of murder in the second degree. Now, if the same rule applies to a case where the charge is for murder by poisoning, then the conviction in this case was legal. The language of the statute strongly favors such a construction. It provides that murder perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing, shall be murder in the first degree; thereby implying that in all cases the crime must be the result of a willful, deliberate, and premeditated act. Hence, if any case can be supposed where murder may be committed by means of poison, and not be the result of such an act, then a conviction of murder in the second degree may be legal. And we do not feel ourselves authorized to say that the case under consideration might not have been one of that description, and consequently, that the verdict is not right. Indeed, we are rather inclined to consider such the fair construction of the statute, especially as it is a highly penal one, and such construction operates against the greater severity.' The statute specifically declares that all murder—that is, the killing of a human being with malice aforethought—perpetrated by means of poison is murder in the first degree, thus fixing the one and only degree of murder perpetrated by means of poison. We cannot conceive of a case where murder thus committed can be other than of the first degree. Such a killing is not only with malice aforethought, but is by statute declared to be willful, deliberate, and premeditated, because, in the very nature of the act it must be so. It is impossible that one can with malice aforethought take the life of another by means of poison without doing so willfully, deliberately and, and premeditately. It is not suggested in *State v. Dowd* how such a case can be murder in the second degree. When the charge is of murder by lying in wait, or other willful, deliberate, and premeditated killing, or in the commission of any of the other crimes named, we have quite a different case, as in

those cases there may be murder without the aggravating circumstances. One convicted of murder by lying in wait is guilty in the first degree, but, if he committed the murder without lying in wait he is guilty in a less degree. His guilt of murder does not depend upon his lying in wait, but simply the degree of his guilt, and so as to the other offenses named in section 4728. In those cases there may be guilt of murder without the aggravating circumstances that fix the degree, but in murder perpetrated by means of poison there is but one degree, and the crime either exists in that degree or not at all. There being but one degree of the crime charged, the statutes and decisions as to cases consisting of different degrees do not apply. In such case there is no issue as to degree, and no degree to be determined by the jury. *Robbins v. State*, 8 Ohio St. 132, is not in point. In that case the conviction was of the first degree, and the principal question discussed is whether, in cases of murder by means of poison, there must have been an intention to take life—a question not involved in this case. In *State v. Wells*, 61 Iowa, 630, the conviction was in the first degree, and the question under consideration was not passed upon, nor was *State v. Dowd* approved. The question there considered was whether an intent to kill must be proven. It follows from what we have said that there can be no state of the evidence that will warrant the defendant's conviction in the second degree. He is either guilty in the first degree or he is not guilty of murder. In *State v. Cater*, 100 Iowa, 502, we held that the statute requiring the jury to find as to the degree does no apply where the facts show that the defendant is either guilty of the crime charged or is innocent of any offense. See, also, *State v. Smith*, 102 Iowa, 657, and *State v. Van Tassel*, 103 Iowa, 9. Whether the defendant may be tried, under this indictment, for manslaughter, has not been argued, and is not decided."

We further held on that submission that this error in the instruction was prejudicial to the defendant, Justices

Waterman and Ladd dissenting as to that conclusion. On the petition of the state, rehearing was granted that we might, aided by further argument, review our conclusions upon these points, and, if necessary, consider other errors assigned and argued.

We have again considered the case with the care which its importance demands, and are united in the opinion that the instruction was erroneous in the respect complained of, but we are equally divided as to whether the error was prejudicial to the defendant, and therefore, under the law, the giving of said instruction stands affirmed, as being without prejudice to the defendant. This renders it necessary that we now consider the other errors assigned and argued on behalf of the defendant.

II. It is contended on behalf of the defendant that the verdict is not warranted by the evidence, and that, therefore, the court erred in not sustaining his motion for a new trial on that ground. "The rule in such cases is different from that applied in civil cases. This court, though proceeding carefully and cautiously, will interfere in criminal cases more readily than in civil. We will not, in a criminal case, support a verdict if it be against the clear weight of the evidence." *State v. Wise,* 83 Iowa, 599, and cases therein cited. It is a familiar rule that if, upon all the evidence, a reasonable doubt exists as to the guilt of the accused, that doubt must be resolved in his favor, and he acquitted. Unless, upon all of the evidence, it is so proven that the death of Charles Selhusen was caused by poison, the defendant should have been acquitted. There is no question as to the death of Charles Selhusen, and the evidence as to the cause of his death is substantially as follows: On Sunday morning, September 12, 1897, Selhusen received some injuries when alighting from a standing engine in the roundhouse where he was empolyed, by stepping on something that turned under his foot and threw him against the engine. Not-

withstanding the injury, he walked home, and was up and about until Monday afternoon, September 13th, when he was taken ill and went to bed. He had made but little complaint as to the injury, and only of pain in the foot and ankle. He continued ill until Thursday, September 16th, when he died and was buried on the 19th. The witnesses who were present during his illness all agree that he was very ill, wanted to vomit all the time, was thirsty, and complained of distress in the stomach and pain in the liver. On Tuesday, the fourteenth, Mrs. Kettlehut and Mrs. Selhusen went for Dr. Gruber, who took charge of the case up to Wednesday evening, when he was replaced by Dr. Fairchild. Dr. Gruber says that he discovered no injury except to the foot; that the patient drank water, but could not retain it; and that "from the symptoms I could not get it clear in mind just what was the matter with him; it was somewhat mixed up, because of the injury." Dr. Fairchild says: "Found a failure of the normal action of the vital organs. Ascertained he had been vomiting, purging, and complaining of pain in abdominal region. They said he had passed considerable blood from the bowels, and vomited blood. In the death certificate the cause of death was given as hemorrhage. He complained of tenderness in his abdomen. Judging from the symptoms and history of the case it might have been caused by internal trouble. I discovered no injury that would produce those symptoms. It frequently happens where death ensues that no cause is found." In preparing the body for burial, an embalming fluid containing about 15 grains of arsenious acid to the ounce was injected into the body. On December 27, 1897, the body was taken up and an autopsy performed thereon by Drs. Farnsworth and Kellogg, and Skelly. They removed "the stomach, kidneys, liver, brain, parts of the small intestines, and part of the spinal cord, and placed each in a separate clean bottle, and corked them." These, with about a half pint of embalming fluid of the kind that had been

used, were delivered to Prof. Macey, state chemist, for examination. Dr. Farnsworth testifies: "The stomach was empty and well preserved. There were marks of severe inflammation of the mucous membrane. It was raised in patches and softened like what we call fatty degeneration. It was of a reddish cherry hue. I heard the testimony of Drs. Gruber and Fairchild and Mrs. Kettlehut. From the condition we found the stomach, and having seen crystals of arsenic in the stomach, I should say he died with arsenical poisoning." Dr. Kellogg testifies to the same condition of the stomach, and says: "There were some crystals, in my opinion, that were arsenic. They could not have been produced from embalming fluid injected into the body. Inflammation could not have been produced there after death. It is my opinion that the man died from arsenic poisoning. Dr. Skelly gives it as his opinion that the man died from some irritant poison in the system; that the symptoms point to arsenic. Prof. Macey's testimony, as set out in appellant's abstract, shows that he analyzed the contents of the bottles brought to him by Dr. Skelly. He says: "I found arsenic salts in the embalming fluid. In the stomach I found, on the inner walls, crystals of arsenious oxide. The stomach showed inflammation caused during life, and fatty degeneration. The crystals I found could not have been deposited there by embalming fluid. I have made an analysis of rough on rats and rat poison. Q. What is the poisonous ingredient of rat poison? (Objected to as calling for incompetent, immaterial, and irrelevant testimony. Overruled. Defense excepts.) A. Both have arsenic in form the same as these crystals that I found in the stomach. I received the jar which you see here by the U. S. Express, sealed. I analyzed the contents of the jar. To the bottom, inside, and sides of the jar adhered some dry material, in which I found arsenic in a small quantity." He further says that embalming fluid containing arsenic injected into a cadaver would

be absorbed and permeate through the entire cadaver after three months' time, and would probably be found in all parts save the bony tissues, and that in the embalming fluid which he examined he found 30 grains of arsenic to the ounce, "expressed as arsenious oxide." In appellee's additional abstract, that is not denied, it is shown that he testified that he found in the brain 1 7-10 grains of arsenic, 3 grains in the liver, 2 31-100 grains in the stomach, 80-100 grain in the kidneys, a small quantity in the spinal cord, and a small quantity in the small intestine; that he found no zinc in the brain, a small quantity in the liver, a small quantity in the stomach, a small quantity in the kidneys, each too small to determine, and none in the spinal cord or intestines. He says the embalming fluid contained about equal parts of arsenic salts and zinc salts. He further says the stomach showed evidence of inflammation and fatty degeneration, and that the crystals of arsenic found in the stomach could not come from the embalming fluid, "because the arsenic in the embalming fluid was in a soluble form, and would pass through the walls of the stomach, and leave no crystals behind. The crystals, such as I found in the stomach, is the same kind of arsenic that is used in rat poison." If it were not for the fact that embalming fluid containing arsenic was injected into the body after death, the conclusion would be irresistible that the death was caused by arsenic. The condition of the stomach precludes the conclusion that the arsenic found therein came from the embalming fluid. The inflammation and fatty degeneration in the stomach that must have ensued before the death were such as would exist from taking arsenic into the stomach during life, but would not from arsenic injected after death. Again Prof. Macey says: "The crystals of arsenic that I found in the stomach could not come from the embalming fluid," and gives the reasons therefor. The jury was warranted in finding that the deceased came to his death because of arsenic poisoning.

III. Accepting it as established that the death of the deceased was caused, by arsenic poisoning, we inquire whether it is shown to have been feloniously administered, and, if so, whether this defendant was concerned therein.

The claims on behalf of the state are these: That because of illicit relations and affections existing between this defendant and Mrs. Selhusen, and a purpose on their part to get the property of the deceased, and because of ill will toward the deceased, they conspired to get rid of him by causing his death; that a poisonous preparation containing arsenic, known as "Rough on Rats," that this defendant had brought to the house some time before, was put into a jar of blackberry jam prepared by the defendants to be, and which was given to the deceased to eat, and that his death was caused by said poison. The evidence bearing upon these inquiries is so blended that we will not attempt to separate it. It is substantially as follows: For five years prior to his death the deceased, his wife and her son, Willie, aged 19 in 1897, resided together in Clinton, Iowa. For about three years prior to September 12, 1897, the defendant Bertoch resided with them. On the morning of September 12, 1897, this defendant took his trunk and went to live in the home of his brother, in the same city, it having been previously arranged between the brothers that he should do so if the brother found a place for the defendant to work, which he had done. As to the relations between this defendant and Mrs. Selhusen, we have the testimony of the boy Willie alone, corroborated to some extent by the testimony of one Worrell. Willie testifies that there were two beds in the house; that Selhusen worked at night; that this defendant had slept with Mrs. Selhusen, and that Mr. Selhusen knew it. He is not definite as to the length of time they slept together, but it was for a year or more prior to September, 1897. Worrell testifies that in the summer of 1897 the defendant had his face scratched;

that he asked him what was the matter; that he said he had some trouble with the old man, "and I asked him if the trouble was about the woman. He said, substantially, that it was." Mr. Worrell gives this as his "impression of what took place." As to the state of feeling among these three persons we have the testimony of Willie, and of three persons named Monsky, who lived next door. Mr .Monsky says: "Heard quarreling between Theodore Bertoch and Charles Selhusen. They quarreled there very often for the last two or three weeks before Selhusen's death. The first quarrel I ever heard was two years ago or so. It was very seldom they quarreled in the first year; the last two weeks awfully. I mean by quarreling they were cursing, fussing, or giving hard words." This witness says he was not friendly with the defendant. Mrs. Monsky says they quarreled often; that at one time the men were doing work; that one wanted it one way, and the other another; and that Mrs. Selhusen came and told Mr. Selhusen to go into the house, and go to sleep, and Theodore would do the work. Another Mrs. Monsky testifies to the same transaction. Says that it was two or three weeks before Selhusen's death, and that Selhusen dropped his work and went into the house. She says: "I mean by quarreling that they cursed each other; they couldn't agree in their work." The boy Willie went to the country to work in the spring of 1897, and was only at home once every four weeks. He was at home Sunday, September 12th, up to 4 o'clock. He says: "Father and Theodore were quarreling always ever since he came. Mother took Theodore's side. I cannot tell the first time there was quarreling. The last time was about two months before I went into the country. Charles Bertoch was there also. They quarreled, so far as I know, five or six times. I mean by quarreling, fussing. One of them would know too much about something around the premises, and they would have words with each other. I don't know how many times they came to blows. After fighting, they were

good friends." He says Selhusen knew that Bertoch slept with his wife, "and this caused the trouble," but again he says that it was about something around the premises. It does not appear that in these wars of words Mrs. Selhusen was ever mentioned as the cause of the quarrels, nor that she ever took sides in the quarrels, except upon one occasion, when she told Selhusen to go into the house, and go to sleep, that Theodore would do the work. As to the purpose to get the property of Selhusen, the only evidence is that on an occasion when Selhusen was about to execute two leases on properties which he owned, to the suggestion of Bertoch, who was present, a clause was inserted that the lease should be void at the election of the parties in case of the death of either—a suggestion which was acted upon. On one occasion, in 1897, he said to a witness: "In case Mr. Selhusen died, he was to have one-half of his property." Some considerable time prior to the death of Selhusen, the defendant Bertoch brought to the house some rat poison in a round wooden box, and put it on the window sill, saying he wanted to poison rats with it. He had done the same thing previously, a year or more, and he and Selhusen had put the poison out. Mrs. Monsky testified: "In August, 1897, I saw Theodore and Mrs. Selhusen putting up blackberries on the back porch. They picked them, and put them into a kettle, and cooked them, and put them in jars, and carried them to the cellar." The boy Willie was asked: "Q. Do you remember any circumstance about some fruit—bringing up some fruit at one time which contained poison? A. Yes, sir. Q. State about it." To this the defendant objected as incompetent, immaterial, and irrelevant. The court held that if the defendant was not present, and did not know about it, it would be incompetent. Thereupon the boy was asked: "Q. Was Theodore Bertoch at home when you brought that fruit up? A. I guess so; I do not know about that. Q. When was it—on Sunday? A. It was on Sunday. Q. Who was there? A. Me and

my mother, and I guess he was there too.   Q.  Now state to
the jury what happened.   (Same objection by the defense.
Objection overruled.   Defendant excepts.)"   The further
objection was made that "it is calling for no state of facts
that would be competent against the defendant, and on the
ground that it attempted to show a conversation with Mrs.
Selhusen, which is incompetent under the Code, she now
being the wife of the defendant.   Objection overruled.   De-
fense excepts."   The witness answered: "She said I should
fetch up a glass.   She said there was poison in it."   The de-
fendant moved to strike out the answer, "because it shows
what she (Mrs. Selhusen) said, and it is attempted in that
manner to introduce her evidence as a witness in this case.
Motion was overruled.   Defense excepts."   Witness was then
asked: "Q.  State what occurred.   (Same objection, ruling,
and exception.)   A.   She said she had a glass that
matches fell in, and it was poison.   Q.   Had you brought
the glass up?   A.  Yes, sir.   Q.   A glass of what?   A. Jelly;
she said there was poison in it.   Q.   What did you do with
it?   A.   I brought it back again.   Q.  Did she tell you to
take it back?   (The defense makes the same objection as
made to this examination at first.)   By the Court:  If the
jury does not find that this defendant was present, it is in-
competent.   It will be submitted to the jury for the pres-
ent.   (Objection overruled.   Defense excepts.)   A.  Yes, sir.
Q.  What did you do with it?   A.   I took it back again.   Q.
Where did you put it?   A.   In the cellar—the same place it
was.  Q.   Did you bring up another glass?   (Objected to by
the defense as incompetent, immaterial, and irrelevant.   Ob-
jection overruled.   Defense excepts.)   A.   Yes, sir.  Q.
Did you use that glass?  A.   Yes, sir."   On cross examina-
tion, the witness testifies, as to when he brought up the glass
of jelly.   "It was in August, I guess;" and afterwards said
that he did not know when it was, but leaves it certain that
it was not on Sunday, the twelfth day of September, 1897,
when he was at home.

The defendant was arrested on the twenty-seventh day of December, 1897, and on that night Mr. Burke, chief of police, went to the Selhusen house, and got the jar that was sent to Prof. Macey, which the defendant admitted was such a jar as Mrs. Selhusen had. Mr. Burke says: "It contained what appeared to be a jelly on the inside." Prof. Macey says: "To the bottom, inside, and sides of the jar adhered some dry material, in which I found arsenic in a small quantity." There was nothing to show that this jar was like any of those into which the blackberries had been put, or that it was like either of those brought by the boy from the cellar. There is an entire absence of evidence showing that the deceased ever partook of the contents of the jar that was sent to Prof. Macey, or of any jars into which the fruit was put. If he was poisoned by eating it, he must have eaten of the fruit on Monday, the thirteenth day of September; but we are without any evidence whatever that he then ate of the fruit, except the fact of his sickness and death. If we may infer that his death was caused by eating of that poisoned fruit, there is no evidence whatever that this defendant had anything to do with poisoning the fruit or with giving it to deceased. There is no evidence that he knew that any of the fruit was poisoned unless he was present to hear what Mrs. Selhusen said to her son, and we have a mere guess of the boy that he was present. Concede that he was present, and heard what Mrs. Selhusen said, yet all that he would know therefrom was that matches had fallen into a jar, and it was poisoned.

The fact that long prior to September 13, 1897, this defendant brought rat poison to the house, is so explained as to preclude the conclusion that he brought it for the purpose of being used to take the life of the deceased. If it should be said that the poison was feloniously administered, there is not sufficient evidence connecting the defendant therewith. The deceased was taken sick on Monday afternoon, and

must have taken poison on that day. There is no evidence that this defendant was at or near the Selhusen house after he left it early on Sunday morning, nor that he had any opportunity to administer the poison at the time it must have been taken. There is not sufficient evidence to warrant the finding that the defendant had knowledge of, or participated in, a purpose to take the life of the deceased by administering poison to him. Our conclusion is, after most careful consideration of all the evidence, that it fails to sustain the verdict, and therefore the judgment of the district court is REVERSED.

GRANGER, C. J., not sitting.