STATE OF IOWA v. WALTER M. WHITBECK, Appellant.

Criminal law: MURDER : EVIDENCE OF POSSESSION OF ARTICLES OF CLOTHING.
1  Where it appeared on a prosecution for murder that certain articles of clothing were in the possession of certain witnesses from the

time of defendant's arrest until produced before the grand jury, and from that time until the trial they were kept in a valise in the office of the sheriff where it was not readily accessible, although not sealed; and where it appeared that the articles were in the same condition at the trial as when produced before the grand jury, their possession was sufficiently accounted for to negative any reasonable claim that they had been changed or tampered with from the time they were taken from defendant until they were introduced upon the trial.

**Same:** EVIDENCE OF COMPARISON. Any competent witness, though not an expert, may state his opinion resulting from such a comparison as an ordinary person could make, when the objects to be compared are not introduced in evidence, and the jury therefore has no opportunity to make the comparison; as where hair offered in evidence was taken from a club with which deceased was supposed to have been killed, and also from the clutched hand of deceased, but none taken from his head with which to make the comparison, was offered in evidence.

**Same:** EVIDENCE OF DELIBERATION: PREMEDITATION: MALICE. It is not necessary that there should be specific evidence of premeditation, deliberation or malice aforethought in a prosecution for murder; but where there is evidence tending to show that death resulted from blows inflicted with a heavy club, which, under proper instruction might be found to be a deadly weapon, premeditation and deliberation are to be determined from the proven circumstances.

**Same:** INSTRUCTION: ASSUMPTION OF FACTS: ASSAULT: DEADLY WEAPON. Where there is nothing in the evidence indicating an assault to have been made, save with some instrument, an instruction directing the jury to determine the character of the instrument with which the blow was struck, if one was struck, does not assume that an assault was made by the defendant. And where the jury was instructed as to the presumption arising from the use of a deadly weapon, and also defining a deadly weapon, the further instruction that in determining whether an assault was made by defendant with a deadly weapon, consideration should be given to all the evidence bearing on the subject and the nature and character of the instrument with which the blow was struck, if one was struck, the manner of its use, the part of the body struck, and whether or not the weapon might be dangerous to life, could not have misled the jury into understanding that they were to consider the nature of the weapon, etc., in determining whether an assault was made by defendant.

**Same:** CIRCUMSTANTIAL EVIDENCE: INSTRUCTION. An instruction that

to warrant conviction upon circumstantial evidence the circumstances should all concur in showing that defendant committed the crime, and be inconsistent with any other rational conclusion, includes the thought that the circumstances must be inconsistent with the commission of the crime by another.

Same: ALIBI: INSTRUCTION. Where the jury was told that the burden was upon defendant to prove an alibi by a preponderance of the evidence, the further instruction that to be entitled to consider the defense of alibi the evidence must be such as to show that at the very time of the commission of the crime charged, the accused was at another place so far away that he could not ordinarily have reached the place where the crime was committed to have participated therein, was not open to the objection that it related to the commission of the crime by the defendant.

Same. An instruction which distinguishes between the consideration to be given to evidence tending to establish the defense of an alibi, and its consideration with other evidence as raising a reasonable doubt of defendant's guilt is proper.

Same. While it is proper for the court to direct the jury to scan the proofs of an alibi with care and caution, no such instruction is required with respect to evidence contradicting the same, unless there is something to indicate that the evidence for the State was manufactured; as all the evidence on the part of the prosecution tends to contradict the evidence of an alibi.

Evidence: IMPEACHED WITNESS: CREDIBILITY: INSTRUCTIONS. Jurors are not bound to disregard the testimony of an impeached witness, but they may give it such weight as they think it entitled to; and any-error in instructing that they may, rather than must, consider the fact that a witness has been impeached in determining the weight to be given his testimony is harmless, where from all the instructions on the subject taken together it is clear that the jury in following the same must have determined the credibility to be given the testimony of the witness, and have given it such weight as they believed it entitled to under all the circumstances.

Same: CREDIBILITY OF EVIDENCE: INSTRUCTION. Where the books of account were introduced as a foundation for testimony to support defendant's alibi, in which there was an apparent erasure and to which the attention of the witness was called, an instruction that the appearance of the books might be considered in determining the weight to be given the testimony dependent upon the book entry, was proper, though there was no evidence that the erasure had been made in defendant's interest.

**Opportunity for commission of crime: INSTRUCTION.** Where under the instructions there could have been no doubt in the minds of the jurors as to their duty to acquit, if conviction depended upon proof of opportunity alone, refusal of the court to specially instruct that opportunity alone does not establish the commission of a crime, or connect the defendant therewith, was not prejudicial.

**Murder: PROOF OF MOTIVE.** Proof of motive is not essential to conviction for murder, though its absence may have weight with the jury in determining the credibility of the evidence.

**Same: ALIBI: EVIDENCE.** On a consideration of the whole evidence in the case it is held that defendant's proof of an alibi was not so free from doubt and uncertainty that the jury could not have reasonably disregarded it and returned a verdict of guilty.

*Appeal from Fayette District Court.*—HON. A. N. HOBSON, Judge.

THURSDAY, DECEMBER 16, 1909.

APPEAL from conviction of murder in the first degree.—*Affirmed.*

*Clements & Estey,* for appellant.

*H. W. Byers,* Attorney-General, *Charles W. Lyon,* Assistant Attorney-General, *W. C. Lewis,* County Attorney, and *D. D. Murphy,* for the State.

McCLAIN, J.—Defendant was charged with the murder of his father, Arlow Whitbeck, on the evening of March 18, 1908. The circumstances attending the killing, as charged, were such as tended to show willfulness, deliberation, and premeditation, and the conviction was for murder in the first degree. There was substantial evidence to support the theory of the prosecution that the crime was committed as follows: On the 17th of March, the day preceding the murder, defendant, who was about thirty-

three years of age and had been residing with his parents for about three years on their farm working for his father for compensation, assisted his father in loading a wagon with hogs to be hauled to Ft. Atkinson, the nearest town on a railroad. He accompanied his father with the hogs part way to the town of St. Lucas, on the road to Ft. Atkinson, when they were overtaken by one Strickland driving a single buggy with whom defendant asked to ride and with whom he did ride to St. Lucas, from which place he walked part of the way and rode part to Ft. Atkinson. Defendant's expressed purpose was to take a train at Ft. Atkinson to St. Paul from which point he proposed, according to previous conversations with his neighbors, to go to Duluth, visiting on the way places at which he had previously worked. At St. Lucas he said he should take the train before noon at Ft. Atkinson, if he reached there in time. He did arrive in time for the train at 11:30 a. m., and was seen on that train going to St. Paul, where he arrived in the evening and registered and spent the night at a hotel. He left this hotel the next morning, that is, the morning of Wednesday, the 18th, on the evening of which the murder was committed, and was not seen again at the hotel until the evening of the 19th, when he again registered and spent the night there. On the forenoon of the 18th defendant was seen on a train from St. Paul to Ft. Atkinson, from which he alighted at the latter place between two and three o'clock in the afternoon. He was seen about Ft. Atkinson that afternoon by several people, and during the early part of the evening a person of the general description of the defendant, dressed as he had been dressed when seen at Ft. Atkinson, was observed by several witnesses making his way along or near the road from St. Lucas towards his father's home. About eight o'clock in the evening Strickland, with whom defendant had ridden the day before a part of the way to St. Lucas, and who lived a few hundred

rods from the Whitbeck home, went there to see Arlow Whitbeck, and going up the roadway to the barn, by the light of a lantern setting in the doorway of the barn, saw and recognized defendant, who walked away and disappeared, and found the body of Arlow Whitbeck, who was already dead, lying in front of the barn door on the driveway. The head of deceased appeared to have been crushed in by repeated blows from a wagon stake which was in a wagon bed with other stakes of the same description a few feet from where the body lay. The heavy end of the stake was covered with hair and blood and the face and part of the body was covered with blood, but there were no wounds on the body. There were no evidences of a struggle. The right hand of deceased was covered with blood, and there was hair inside the clinched palm and fingers. As above indicated, defendant was at the hotel in St. Paul on the evening of the 19th and stayed there all night. On the 21st and 22d he was seen at Rush City which is on the railroad between St. Paul and Duluth, and he was arrested at Duluth on the 24th. In this skeleton statement of the evidence many details have been omitted and no reference has been made to contradictory evidence which might tend to throw doubt on the testimony of witnesses supporting this brief statement which will, however, furnish a sufficient basis for the discussion of many of the alleged errors of law relied upon for the appellant.

I.   On the trial the court received in evidence for the prosecution the overcoat which defendant wore at the time he was put in jail at West Union after having been brought

1. CRIMINAL LAW: murder: evidence of possession of articles of clothing.

there from Duluth, and a pair of gloves found in the pocket of that coat. The gloves had on them stains which an expert testified were blood stains. The introduction of these articles in evidence was objected to on the ground that they were not properly identified by proof of continuous custody in the hands of the witnesses who testified from the

time they were taken from the defendant until they were
offered on the trial. Without setting out in full the evi-
dence in this respect, it is sufficient to say that we do not
find the objection well founded. The custody of these
articles was sufficiently accounted for by witnesses who
showed that they had possession of them until they were
offered in evidence before the grand jury, and that the
gloves were then in the condition in which they were
subsequently found to be when they were offered on the
trial of the case. In the meantime they had been kept
in a valise belonging to the defendant (which, however,
was not introduced in evidence), and had been in the
office of the sheriff. The valise was not sealed, and
the office was open to the public, but the valise was put in
a place where it would not have been readily accessible,
and in view of the fact that the gloves appeared to have
been in the same condition when they were produced be-
fore the grand jury as they were when offered on the trial,
we think there was no error in permitting their introduc-
tion. The possession of the overcoat and gloves was suffi-
ciently accounted for by witnesses testifying on the trial
to negative any reasonable claim that they had been
changed or tampered with from the time they were taken
from defendant's custody to the time when they were in-
troduced in evidence.

II. One of the doctors who made the *post mortem*
examination of the body of deceased early in the morning
of the day after it was first discovered testified that there
was in the right hand of deceased which was
clinched some hair and tissue, and that on
comparison he found it to be similar to hair
taken from the head of deceased and to the hair found
on the club with which the blows on the head of deceased
appear to have been inflicted. The objection to this evi-
dence of comparison by the doctor was overruled, and as
we think without error. The doctor did not qualify to

2. SAME: evi-
 dence of
 comparison.

testify as an expert, but a nonexpert may give his opinion as the result of such comparison, if there is no better evidence available. *Commonwealth v. Dorsey,* 103 Mass. 412; *Crumes v. State,* 28 Tex. App. 516 (13 S. W. 868, 19 Am. St. Rep. 853). This principle has been approved by this court as applied to footprints. *State v. Millmeier,* 102 Iowa, 692. Hair taken from the head of deceased was not offered in evidence, but exhibits consisting of hair taken from the club and hair taken from deceased's right hand were introduced. There was, therefore, no opportunity for the jury to compare the hair of deceased with the hair found in his hand, and the testimony of the doctor was not open to the objection that the jurors were as competent as he to make such comparison. This was the objection sustained to expert testimony as to comparison of hair in the case of *Knoll v. State,* 55 Wis. 249 (12 N. W. 369, 42 Am. Rep. 704). We think any witness competent to state his opinion as the result of such comparison as an ordinary person could make when the objects to be compared are not introduced in evidence. A witness should not be confined to a statement of points of similarity merely, for it would be impracticable to so describe the particular points of resemblance as to put the jury in the same position as the witness to determine the question of similarity. At most the testimony received had very slight bearing on the case. The only advantage defendant could have from the appearance of the hair found in the hand of deceased would be as pointing to some other person than defendant as the one who committed the murder. No claim was made for defendant that the hair resembled that of any other person who might have been guilty of the crime. There was certainly no prejudicial error in the ruling.

III. Complaint is made of instructions submitting to the jury the question of defendant's guilt in the first or in the second degree of murder on the ground that the

evidence did not tend to show murder in either degree. By
this objection counsel seek to have us pass
specifically on the sufficiency of the evidence
as to willfulness, deliberation, and pre-
meditation, and as to whether the killing was with malice
aforethought. This is not within our province. The suffi-
ciency of the evidence to support the verdict will be here-
after considered, but we are not called upon to determine
whether as a matter of law there was specific evidence of
premeditation, deliberation, or malice aforethought. *State
v. Baker,* 143 Iowa, 224; *State v. Dillingham,* 143 Iowa,
282. The evidence tended to show that the blows which
caused the death of deceased were inflicted with a heavy
club which under proper instructions on this subject may
have been found to be a deadly weapon, and deliberation
and premeditation were to be determined in the light of the
circumstances as they appeared from the evidence.

IV. In one of the instructions the court told the
jury that it would be presumed from the voluntary use
of a deadly weapon in a manner known to be calculated
to destroy life, if death resulted therefrom,
that such result was intended in the absence
of evidence to the contrary, and in the fol-
lowing instruction a deadly weapon was de-
fined as one likely to produce death or great bodily injury,
and the jurors were told that "in determining whether an
assault was made by defendant upon Arlow Whitbeck with
a deadly weapon, you will consider all the evidence bear-
ing upon the subject, and determine therefrom the nature
and character of the instrument with which the blow was
struck (if one was struck), the manner of its use, the part
of the body struck, and whether the use of the weapon
might be dangerous to life or not." This last instruction
is objected to on the ground that it either directs the jury
to consider the nature of the weapon, etc., in determining
whether an assault was made by defendant, or assumes

3. SAME: evidence of deliberation, premeditation, and malice.

4. SAME: instruction: assumption of facts: assault: deadly weapon.

that he made such assault, and leaves it to the jury to say whether the weapon with which it was made was a deadly weapon, and it is argued that in either view the instruction is erroneous, and in any view confusing. But the objection is hypercritical. The jury is told to determine the character of the instrument "with which the blow was struck (if one was struck)," and it is not pretended that under the evidence there could be any finding of assault save with some instrument. The instruction does not, therefore, assume that an assault was made by defendant. The plain meaning of the instruction is that if the jurors find an assault to have been made by defendant, they shall then consider whether it was made with a deadly weapon.

In a previous instruction the jurors were particularly told that only after finding deceased to have come to his death by the unlawful act of another person would it be necessary for them to determine whether defendant was that guilty person, and that "if after such full and careful consideration of all the evidence you find that the said Arlow Whitbeck came to his death by the unlawful act of another person, and you further find the defendant guilty beyond a reasonable doubt, you will then proceed to ascertain from the evidence the precise character of his crime, bearing always in mind that what follows in these instructions in regard to the different crimes involved can have no application, unless you find the defendant guilty." There is not the slightest possibility under the instructions given that the jury could have been misled as to the purpose for which they should determine the nature of the weapon with which the blow was inflicted and the manner of its use.

V. The instructions as to circumstantial evidence are objected to because they do not require that the circumstances sufficient to warrant conviction must be such as to produce a reasonable and moral certainty that the accused and no one else committed the offense, and that they

should all concur to show that the defendant committed the crime, and be inconsistent with any other reasonable conclusion.   In support of this argument it is contended that the evidence strongly pointed to the guilt of Strickland who was the first person to disclose knowledge of the death of deceased. As to this feature of the evidence, something further will be said when discussing its sufficiency to support the verdict.   Without setting out the instructions as to circumstantial evidence, it is sufficient to say the jurors were told that in order to convict the defendant on such evidence the circumstances should all concur to show that he committed the crime and be inconsistent with any other rational conclusion.   This statement necessarily includes the thought that the circumstances to warrant conviction of defendant must be inconsistent with the commission of the crime by some one else than defendant.   In this connection complaint is made of the failure of the court to give an instruction on circumstantial evidence asked by defendant; but the instruction asked did not emphasize the point now made, and was less favorable to defendant than that given. We find nothing in the case of *State v. Johnson,* 19 Iowa, 230, or that of *Carlton v. People,* 150 Ill. 181 (37 N. E. 244, 41 Am. St. Rep. 346), relied on for defendant, to justify the holding that the instructions given in this case as to circumstantial. evidence were not sufficient and correct.

5. SAME: circumstantial evidence: instructions.

VI.   In a long instruction relating to evidence of an alibi, introduced for defendant, the jurors were told that "the burden of proof rests upon defendant to prove this defense by a preponderance of the evidence before. you, that is, by the greater and superior evidence," and that "the defense of alibi to be entitled to consideration must be such as to show that at the very time of the commission of the crime charged the accused was at another place so far away or under such cir-

6. SAME: alibi instruction.

cumstances that he could not with ordinary exertion have reached the place where the crime was committed so as to have participated in the commission thereof." The first criticism of this instruction assumes that the expression, "the commission of the crime charged" relates to its commission by the defendant, but any such construction of the language is manifestly absurd. The jurors had already been told to consider; first, whether the crime of murder had been committed, and afterwards, to determine whether it was the defendant who committed such crime. If the jury found the crime of murder to have been committed, but found that defendant was at another place, etc., then, as they were told, they could not convict. Under this view of the instruction, which was the only one which could reasonably be entertained, it was manifestly correct.

But it is more seriously argued the jurors were to understand that they should give no consideration to the evidence of alibi, unless that defense was established by a preponderance of the evidence. This is not the language of the instruction. The jurors are told that the defense of alibi is not made out unless established by a preponderance of the evidence, but in the remainder of the instruction, which need not be quoted in full, they are told that if the evidence relating to alibi "either standing alone, or in connection with the other evidence in the case, raises in your minds a reasonable doubt of defendant's guilt, you will acquit him." The distinction which the court observes between the consideration to be given to evidence as establishing the defense of alibi, entitling defendant on that ground alone to an acquittal, and its consideration with other evidence as raising a reasonable doubt of defendant's guilt, has been too long recognized by this court to justify a further discussion of it. *State v. McGarry,* 111 Iowa, 709; *State v. Maher,* 74 Iowa, 77; *State v. Nugent,* 134 Iowa, 237; *State v. Worthen,* 124 Iowa, 408, 413.

7. SAME.

In the instruction as to alibi was the usual cautionary clause of which complaint is made not on the ground that it was in itself improper, but that a like cautionary clause was not appended to the instructions relating to the credence to be given the testimony for the prosecution which tended to overthrow the evidence in support of an alibi. The ordinary instructions directing the jury to scan the proofs of an alibi with care and caution because the defense is one easily manufactured, is a stock instruction so often approved that authorities in its support should not be required. *State v. Worthen, supra.* But our attention is not called to any authority requiring any such caution to be given regarding the evidence contradicting an alibi. All the evidence which tends to show that the defendant committed the crime is evidence tending to overthrow proof of an alibi, and there is no occasion for any specific instruction against manufactured evidence on the part of the prosecution, unless there is something to indicate that such evidence has been introduced or offered. There was good reason in this case, as will hereafter appear, to instruct the jury particularly as to manufactured evidence supporting the alibi defense, and no such reason appears as applicable to the evidence for the prosecution.

8. SAME.

VII. As will hereafter appear, the defendant proved statements by Strickland inconsistent with his testimony that he saw defendant leaving the place where the body of deceased was discovered. On that subject the court gave three instructions, one of which is criticised because the jurors were told that if they believed from the evidence that any witness has been successfully impeached they "may consider such fact in determining the weight to be given to the testimony of such witness," and it is insisted that the instruction should have been mandatory instead of permissive in this respect. The expression used in the instruction was perhaps unfortunate, but taking the instruc-

9. EVIDENCE: impeached witness: credibility: instruction.

tions on this subject together it is clear that the jury following the instructions must have determined the credibility to be given to the testimony of this witness and his explanation of inconsistent statements and given it such weight as they believed it to be entitled to under all the circumstances of the case. If the testimony of Strickland that he saw defendant leave the place where the body was discovered was not true, it was knowingly and intentionally false as to a material matter, and the jurors were told that they might discredit the testimony of such witness, unless the same was corroborated by other credible evidence. We find no prejudicial error in the instructions on this subject. It is well settled that the jurors are not bound to disregard the testimony of an impeached witness, but may give it such weight as they think it entitled to. Jones, Evidence (2d Ed.), section 863.

VIII. As the foundation for testimony of witnesses introduced to support defendant's alibi, certain books of account were introduced in evidence without objection, and

10. SAME: credibility of evidence: instruction.

it appears from the record that the attention of these witnesses was called to apparent erasures in the books. On this subject the jurors were instructed that in the absence of evidence tending to discredit such books, they were presumed to be correct, and that in the absence of evidence showing such books to have been manufactured for or changed to aid defendant, the jurors should not presume that this had been done. The jurors were then told that the appearance of the books might be considered in determining the weight to be given to the testimony dependent upon entries in such books. This instruction was as favorable to defendant as could properly have been asked, and was in substantial accordance with an instruction requested for defendant. As will hereafter appear, there was an apparent erasure which might well be considered in determining the weight to be given to the testimony which depended upon the correctness

of the entry apparently modified by erasure, although there was no evidence that the erasure had been made in ·defendant's interest.

IX.   There was no prejudicial error in refusing an instruction asked for defendant ·that proof of opportunity alone does not tend to establish the commission of a criminal offense or to connect the defendant with the commission of the offense. In view of the instructions given, there could have been no doubt in the minds of the jurors as to their duty to acquit, if conviction was dependent upon proof of opportunity alone.   A similar observation is sufficient to dispose of the complaint that the court refused an instruction to the effect that the presence of the defendant at Ft. Atkinson, and between that place and the Whitbeck farm, on the day Arlow Whitbeck was killed was not alone sufficient to establish defendant's guilt.

11. OPPORTUNITY FOR COMMISSION OF CRIME: instruction.

X.   The sufficiency of the evidence to support the verdict need be considered only with reference to a few particular matters.   It is said there was no evidence of motive, . and it may be conceded that no motive adequate to prompt the defendant to commit the act, if a man of ordinary instincts, is shown, but it does appear that defendant on two or three occasions disclosed a deep seated hostility of feeling towards his father, though this was, so far as he indicated, not based on any wrong or injury either real or fancied.   The relations between the father and son appear not to have been cordial, although they had not, so far as the evidence indicates, been hostile.   Motive is not essential to be shown in such a case although the absence of it may very well have weight with the jury in estimating the credibility of the evidence.

12. MURDER: proof of motive.

The testimony in support of an alibi was given by · four witnesses who described three several transactions in St. Paul with defendant on the 18th of March, when if

he was present at the commission of the crime, he could not have been in that city. Two of these testified to the purchase of a stick pin for seventy-five cents, and identified the date by a book of account in which there is the memorandum of such a sale without the name of a purchaser. They said they remembered making the sale of this pin to defendant. They admitted, however, that another entry of the sale of a stickpin for seventy-five cents appears in the book for March 20th, and that if their attention had been first called to this latter entry, they might have testified that that was the transaction which they recalled. They both denied the existence of any erasure in connection with the price for which the pin was sold on the 18th, but an erasure plainly appears in the book. There is testimony also as to the purchase of a signet ring and the engraving of initials upon it which another witness identified as to date by an entry among memoranda in a little book, apparently covering thirty-nine transactions, occurring from January to September, and shows a memorandum of the engraving of a ring on March 18th with the initials W. M. W. The witness testified that he remembered the transaction, and identified the defendant as the person who had the ring engraved. An examination of the book leaves great doubt in our minds as to its genuineness, and we think it very probable that the jury entertained the same doubt. Another witness testified to the act of the defendant in negotiating with reference to the purchase of an automobile or motor cycle, and identified it by reference to a memorandum of a wholly independent transaction, in which he said as he remembered, he was interrupted by the negotiations with defendant. This evidence relating to alibi was not so free from doubt and uncertainty, not to say suspicion, that the jury could not reasonably discredit it in view of the testimony of several witnesses who knew the defendant and testified that they saw him in Ft. Atkinson on the

*13. MURDER: alibi: evidence.*

afternoon of the 18th. These witnesses were unimpeached, and their testimony was not subject to the possible explanation that they were mistaken in the date and saw him on the 17th when he passed through the town taking the train to St. Paul, for on the 17th he left for St. Paul before noon, and if these witnesses were to be believed, they saw him in the afternoon and later than the arrival of the train from St. Paul. The question of credibility of these witnesses was plainly for the jury.

The only direct evidence which brought the defendant in the immediate vicinity of the place of the murder on the evening of the 18th consisted of the testimony of Strickland, who said that as he came to the Whitbeck barn about eight o'clock he saw and recognized the defendant near the place where he a few minutes afterwards saw the dead body, and that defendant went away toward the northwest, that is, past the corner of the barn and out of sight. Strickland testified that after he saw defendant he noticed the body and went into the barn, and then went to the kitchen door of the house and knocked and asked Mrs. Whitbeck where her husband was, and when she said he must be at the barn, answered that he did not see him there. He then went back to the barn, identified the body as that of Whitbeck, and returned to the kitchen, telling Mrs. Whitbeck that an awful accident must have happened to her husband, and attempted to telephone for neighbors, but was unable to successfully do so on account of his agitation. He then went to the barn and got the lantern and waited until some people came in response to Mrs. Whitbeck's use of the telephone. Mrs. Whitbeck corroborated Strickland in saying that when he first knocked at the door of the kitchen he was very white and seemed agitated, and that when he returned telling her that an accident had happened he was then quite unnerved. Mrs. Whitbeck testified to having opened the kitchen door through which a light would shine toward the barn, a few minutes after her husband

had gone to the barn with buckets of feed for the stock without seeing anything, although she heard a moan which she supposed to come from the hound usually kept tied in the barn. The doctors testified that the blows on the head which probably caused Whitbeck's death appeared to have been struck from behind. It is not at all incredible then that there was no struggle and no noise such as to attract Mrs. Whitbeck's attention.

The most serious difficulty in regard to the testimony of Strickland that he saw and recognized the defendant is that to many persons during that night and in his sworn testimony before the coroner early next morning and to several neighbors to whom he spoke within the next few days he denied seeing any one, protested that he did not know who could have committed the crime, and declared that he had not seen the defendant since he took him to St. Lucas. His own explanation of these contradictory statements, some of which he admitted, though he denied others to which witnesses testified, was that he was scared, frightened, and afraid. But it seems to us not at all incredible that one finding himself alone in the presence of the body of a person recently murdered should be frightened and should be reluctant to disclose the probable guilt of another lest an effort be made at once to fix the guilt upon himself. It may be difficult to analyze the motives of one who should tell an untruthful story under such circumstances, but it is not incredible that such a story should be told. The testimony of Strickland is not otherwise impeached, nor is anything disclosed derogatory to his good character and standing in the community where he had lived for many years. It will not do to say that the jury should have given no credit whatever to the testimony of Strickland in view of his previous inconsistent statements.

As to the argument that the testimony points more strongly to the guilt of Strickland than to that of the defendant it is plain that it is entitled to little weight. No

effort whatever was made in behalf of defendant to show that Strickland was the perpetrator of the crime. The testimony relied on is merely that of Strickland himself and of Mrs. Whitbeck, who noticed Strickland's agitation when he came to the kitchen. If Strickland committed the crime the most natural thing for him to do would have been to disappear from the place of the crime without disclosing himself, hoping that nothing would lead to his detection.

The testimony tending to show defendant's guilt as the perpetrator of the crime was strengthened by testimony as to defendant's own conduct and declarations. Conceding it to be established that he did actually return from St. Paul to Ft. Atkinson on the 18th, there is an inconsistency between his declared purpose in leaving home, and this act of immediate return. Then there is the direct falsification involved in his testimony that he was in St. Paul continuously from the time he arrived there until his departure for Rush City on the 21st, and the attempt to which significance may properly be attached to establish a false alibi.. Moreover, defendant gave no explanation whatever as to any occasion for his remaining in St. Paul from the 17th to the 21st. The only things he did were to purchase a stick pin and a signet ring. He talked about buying an automobile and a motor cycle for neither of which did he have any present use. Aside from these things, according to his testimony, he wandered about the streets and noticed the buildings. He met no one with whom he had previously been acquainted. When he went to Rush City ostensibly for the purpose of hunting, he had no gun and made no effort to procure one, but, as he says, went hunting for rabbits with a revolver and killed one and carried it some distance, thus accounting for the blood on his gloves. He talked for a time with a saloonkeeper whom he said he had previously known. He then went to Duluth where he seems to have had no acquaintances, and was not engaged in any such way as to account for his

being there at the time he was arrested. If his conduct in not attempting to conceal his identity when he returned to Ft. Atkinson is entitled to some credit as indicating an innocent purpose on the other hand his aimless wandering is not consistent with the purpose which he declared he had in mind when he left home. Another significant fact is that when he was arrested in Duluth by the officer from Rush City, without explanation as to the occasion for the arrest, he replied to the question whether he knew of any murder committed at West Union by saying, "No," and when the suggestion was made that it must have happened after he left, he said, "Yes; I can prove that I was in St. Paul or Minneapolis on that day." The date had not been in any way designated or referred to, and he disclaimed any knowledge of the murder, yet he was ready to affirm that on the day of the murder he was in St. Paul or Minneapolis, and could prove it.

The case was fairly tried, the evidence was fully submitted to the jury with clear and fair instructions, and the jury returned a verdict of guilty. In the absence of any errors of law committed in the trial of the case we are satisfied that the conviction should be, and it is, *affirmed.*