STATE OF IOWA, Appellee, v. QUAN SUE, Appellant.

**HOMICIDE: Included Offenses—Unjustifiable Chance for Verdict.** When
1   the record demonstrates that the accused is (1) guilty of murder in the first degree or (2) not guilty, the accused may not complain that the court submitted both *first* and *second* degree murder, and thereby opened the door to the jury to find the accused guilty of a degree of murder *less than that of which he was guilty.*

WEAVER, C. J., and SALINGER, J., dissent.

**HOMICIDE:** Included Offenses—Submission of Manslaughter Without
2   **Evidence.** An accused on trial for murder in the first degree has no right to demand that the court submit to the jury the included offense of manslaughter, *when the record is bare of any evidence tending to prove manslaughter.* The right to demand the submission of included offenses does not embrace the right to demand that the jury be turned loose in whimsical license or latitude to do as it pleases, irrespective of the evidence; and this is true though the court submits murder in the second degree.

**CRIMINAL LAW:** Lack of Motive. Motive is not an indispensable
3   element of crime.

**HOMICIDE:** Suicide as Defense. Evidence reviewed, and held wholly
4   to negative the defense of suicide.

*Appeal from Story District Court.—*E. M. McCALL, Judge.

NOVEMBER 29, 1920.

REHEARING DENIED MARCH 17, 1921.

THE defendant appeals from a conviction of murder in the second degree. The material facts are stated in the opinion.— *Affirmed.*

*Bert B. Welty* and *Fred E. Hansen*, for appellant.

*H. M. Havner*, Attorney General, and *Harry Langland*, County Attorney, for appellee.

STEVENS, J.—The body of Sing Lee, a Chinese laundryman, was found, shortly after noon on .the 22d of February, 1917, in a basement occupied by him for a laundry and living apartments, under a two-story brick business block at Story City, Iowa, with a bullet wound in his left temple. Death had ensued some time during the night preceding. The defendant, Quan Sue, who is the cousin of deceased, arrived in Story City on the morning of February 24th, and later was charged with the murder of Sing Lee, and early in March was apprehended in Butte City, Montana, brought back to Iowa, and tried, the trial resulting in a conviction of murder in the second degree.

The vital questions presented by appellant upon this appeal make an extended statement and analysis of the evidence necessary. The basement, which had been occupied by Sing Lee for a number of years, was entered from the north by a stairway leading into a small hall, and from the rear by a stairway opening into the furnace- and coal-room of the Pioneer Store Company, which occupied the main floor of the building. A vacant room extended the full length of the building on the east side of the basement, and the furnace- and coal-room of the Store Company was located in the southwest corner. The portion of the basement occupied by Sing Lee is situated immediately north of this coal-room and west of the vacant room, and

consisted of an office and workroom combined, washroom, drying-room, bedroom and coal-room. There was a door opening from the furnace- and coal-room of the Store Company into the coal-room of Sing Lee, and from the latter room into the drying-room and bedroom, and from the bedroom into the office and work-room, and from the latter to the west into the washroom. There was also a door leading directly from the hall, entered from the north stairway, into the office and workroom.

The witnesses who discovered the body testified that they entered the bedroom from the rear of the basement. The bed on which the body was lying was in the southeast corner of the room, with the east side and head against the wall. There was also a table standing against the south wall, immediately west of the bed, and within reach of a person lying thereon. The body was lying with the head to the south, turned slightly to the east; the bed covers were neatly tucked around the chin, and extended over the shoulders. His arms and hands were lying across his body, underneath the covers. The bullet entered on the left side, near the temple, and pursued a slightly down-ward course through the head and out on the right side. Blood had flowed from the wound on the right side over the face and down onto the bed comforter. The bed was not disturbed. A cigar box sitting on the table contained a sack, in which there was a quantity of silver coin, and a roll of bills, wrapped in a piece of yellow paper bearing Chinese characters, was found on top of the covers near the foot of the bed. There were also some cartridges on the table, and a blue steel pistol, with one empty chamber, lying on the cement floor between the bed and the table. All of the doors leading into the bedroom were closed, but not latched, and the door leading from the hall at the north end of the basement into the workroom was locked, as was also the door leading from the same hall into the vacant room.

No evidence showing that defendant was in Story City on the night of February 21st, or that he had visited Sing Lee since in January preceding, was introduced. Defendant visited Sing Lee for about three weeks in December, 1916, and again for about two weeks in January, 1917, during which time he roomed at the home of Mrs. Swenson, in Story City. Shortly before defendant left Story City at the end of his first visit, he left

an addressed envelope with A. C. Larson, proprietor of the Pioneer Store Company, with the request that, if Sing Lee got sick, or if anything was the matter with him, Larson would let him know at San Francisco, using the addressed envelope. Either at the time of this conversation or later, the defendant also gave Larson an envelope addressed to a Chinaman in Chicago, and requested that, if Sing Lee got sick, or anything happened to him, Larson would telegraph and write to both addresses. The defendant, at the time of the above conversation, stated to Larson that Sing Lee had a bad cough and was sick, and requested Larson to say nothing to Sing Lee about his condition, or about the request for information, should anything happen to him. The evidence tended to show that Sing Lee was a hard worker, and that he was generally in apparently good health. On the afternoon of February 22d, Larson sent telegrams and also letters, which he inclosed in the addressed envelopes furnished him by defendant, to San Francisco and Chicago. Upon his arrival in Story City on the morning of February 24th, the defendant went to the Pioneer Store and inquired of Larson concerning the death of Sing Lee, and during the day, stated to the mayor, in the presence of other citizens, that he received Larson's telegram at Chicago, about 10:30 P. M., February 22d; and at the coroner's inquest, that he received it at 9.o'clock; and to the county attorney, that he received it at 3:30 P. M., February 22d. He also explained his delay in coming to Story City by saying that he desired to conclude negotiations which he had pending for the purchase of a chop suey restaurant in Chicago.

The proprietor of the Douglas Hotel at Ames, Iowa, testified that a Chinaman registered at his hotel on the evening of February 12th, under the name of Moy Y. Fong, and was assigned a room. Both the proprietor and his wife testified that they saw him register. The same witness further testified that the same Chinaman registered at his hotel on the 20th of February, under the name of Mock Y. Fong. The proprietor of the Ames' Hotel testified that a Chinaman registered on the 22d and 23d of February, under the name of Moy Y. Fong. The leaves of the hotel registers showing the signatures referred to were offered in evidence. Shortly before he left Story City on

his second visit to Sing Lee, he wrote his Chicago address in a memorandum book handed him by the janitor of the building for that purpose, as follows: "Quan Sue, No. 261 W. 22d St., Chicago." On the evening of February 23d, with the assistance of the telegraph operator at Nevada, he prepared and filed the following telegram for transmission to Chicago:

"Feb. 23, Nevada, 1917: Dea Sing Pon, C/o Chee Wo Fong, No. 261 W. 22nd St., Chicago, Ill. If letter telegram for me don't send by mail. I arrive Chicago tomorrow 7 o'clock A. M. From Quan Sue."

The memorandum book and original telegram were offered in evidence, and the signatures bear a close resemblance.

The proprietor of the Douglas Hotel identified the defendant as the Chinaman who registered at his hotel on the evening of February 12th and February 20th. The clerk at the hotel testified, however, that, in his opinion, the defendant is not the Chinaman who registered on February 12th. The proprietor of the Ames Hotel testified that the defendant was the China-man who registered at his hotel on the dates given above. The baggageman at the Northwestern Station at Ames, the keeper of a cafe, the station master, and the station agent who sold him a ticket on February 21st for Randall, identified the defendant as a Chinaman they saw in Ames on that date. Mrs. Pulus, who kept the cafe, testified that she also saw him at her place of business on the morning of February 22d. He was further identified by the conductor and brakeman on the Northwestern train that left Ames on the evening of February 21st at 7:32, as a passenger from Ames to Randall, at which place he left the train. The baggageman at Ames testified that he had a package done up in black oilcloth, tied with a small rope, which was checked to Story City. Other witnesses testified to seeing him in Nevada on February 23d, and one witness, that he saw him alight from an east-bound Northwestern train at Nevada at 8:28 on the morning of February 22d. The station agent and his wife at the Rock Island station at Nevada testified that a Chinaman whom they identified as the defendant, purchased a ticket on the morning of February 23d for Des Moines. The housekeeper at the Ames Hotel and another witness identified the defendant as the Chinaman whom they saw at the hotel on February 23d

and 24th. Nothing is shown of the whereabouts or movements of the defendant after he left the train at Randall, which is a small town a short distance north of Story City, on the evening of February 21st, until he appeared at the cafe in Ames on the morning of the 22d and asked for a cup of coffee. The defendant remained, and received his meals, in his room in a rooming house in Story City on the 25th of February, and, on the evening of the 26th, paid room rent for a week in advance, but left on the same day. He left a suit case and an oilcloth bundle in his room when he went away.

Frank Kirk, hotel clerk at Jewell, Iowa, identified the defendant as a Chinaman who came to the hotel on the morning of the 27th, and slept in a chair until about 6:30. He was further identified by different trainmen as a passenger from Jewell to Rolfe on February 27th, and on to Butte, Montana. This testimony is fully corroborated by statements made later by the defendant to the agent who apprehended and brought him back from Montana. The following circumstances are important, and should be mentioned in this connection. During his second visit to Story City, the defendant took an old, rusty spring lock to a hardware store, and asked to have it fitted with a key. A key was given him, but in a few days he returned, saying that the key was too short; whereupon one was made from a piece of iron. This key was found in the basement, following the murder, and was identified by the tinsmith who made it. The lock had been fastened to the basement hall door leading into the vacant room. He told the dealer he wanted the lock fixed, as he was fixing up the basement for Sing Lee.

Mrs. Charles Armstrong testified that she had a conversation with the defendant in the county jail, in which he said that, in 1913, he had a half interest with Quong Wah in a store at 807 Washington Street, Oakland, California. It was also stipulated by counsel that Baker & Hamilton, hardware merchants at San Francisco, on November 25, 1914, sold a 38 Smith & Wesson revolver, giving factory number, to a Chinaman under the name of Quong Wah, of 807 Washington Street, Oakland, California, and that the revolver found on the floor near the bed of Sing Lee answered the above description.

George Quan Gay testified, through an interpreter, to a

conversation with defendant at the jail, from which the inference may be drawn that he practically admitted guilt; but the meaning of the witness is not quite clear.

I.   We come now to a discussion of the matters relied upon by counsel for appellant for reversal.   The court instructed the jury upon the two degrees of murder, but did not submit manslaughter.   Was it error for the court, upon the record made, to (a) submit murder in the second degree, and if so, was it prejudicial to the defendant; and (b), if the two degrees of murder were properly submitted, was it error for the court not to submit manslaughter?

1. HOMICIDE: included offense: unjustifiable chance for verdict.

Section 4728 of the Code defines murder in the first degree as follows:

"All murder which is perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem or burglary, is murder in the first degree, * * * "

Whoever commits murder otherwise than as set forth in the foregoing section is guilty of murder in the second degree.

It is not claimed by the State that the defendant was seen at Story City on the evening of February 21st, or nearer the scene of the crime than Randall.   The distance from Randall to Story City is about 4 miles, and from Ames to Story City, where he appeared early on the morning of the 22d, about 14 miles. Nothing is known of his whereabouts after he arrived at Randall, until the morning of the 22d.   When he last bade good-by to the janitor of the building in which the laundry was located, he told him he was going to Chicago, from which city Larson later received a letter from him.   Except for the confidential conversation had with Larson, and the request made of him that, if anything should happen to Sing Lee, notice inclosed in addressed envelopes furnished him by the defendant be mailed at once, and his false statements as to his whereabouts at the time of and immediately after the tragedy, the evidence would be utterly insufficient to sustain a conviction of the defendant. While Sing Lee, upon one occasion, said to the janitor, "Me sick, me no good," there was no evidence that he was not generally in good health.   He was industrious, and took care of a good busi-

ness. This is material, however, only as throwing light upon the motive of the defendant in requesting that he be notified if anything should happen to Sing Lee. This transaction must be interpreted in the light of what followed. Something did happen to Sing Lee that was not foreshadowed by his illness, if he were, in fact, ill. Upon his arrival at Story City on the morning of the 24th, the defendant proceeded at once to excuse his seeming delay in returning from Chicago, and at the same time announced that the telegram sent by Larson was delivered to him there. He was not in Chicago on the 22d, when the telegram was sent, and when he claims it was delivered to him. He was in Ames on the 21st and 22d, and at Nevada on the evening of the 23d. Instead of receiving the telegram at Chicago, as claimed, he sent a message from Nevada to Chicago, requesting that telegrams and mail be held until his arrival, the following morning, evidently to prevent same from falling into the hands of someone who might use it against him. No witness was called to testify that he was in Chicago, as claimed, or that he was not at Ames or Randall, as shown by the testimony of the trainmen, although it would seem manifest that witnesses could have been produced who knew his whereabouts during the time in question. The revolver found on the floor and previously seen in the possession of the defendant was identified as one purchased by a Chinaman with whom the defendant claimed to have been in partnership in San Francisco. When the bedroom of deceased was first entered, on the afternoon of February 22d, his body was lying upon the bed, completely covered. The comforter was tucked in closely around his neck, his arms and hands lying underneath the same. There had been no struggle, resistance, or combat of any kind. The bed clothing was in perfect condition, and the blood had flowed from the wound on the right side of the head, over the face and onto the covers. The evidence is conclusive that a murder was committed. The defendant was at Ames, Randall, and Nevada when he represented that he was in Chicago. Instead of receiving at Chicago the telegram sent by Larson on the 22d, he wired Dea Sing Pon from Nevada, on the evening of the 23d, not to forward telegrams or mail, as he would arrive in Chicago on the following morning. Instead of

going to Chicago, he went to Story City, and immediately inquired of Larson as to what was known concerning the tragedy.

The only reasonable inference to be drawn from his conduct before and after the crime was committed, is that, at the time of the conversation with Larson, he was deliberately planning to take the life of Sing Lee, and seeking to lay the foundation for an alibi. After his arrest, he stated to the conductor in charge of the train on which he rode from Ames to Randall on the evening of February 21st that he did not go to Randall; that he was in Chicago; that he had an alibi; that the witness should be careful, as all Chinamen looked alike. None of the matters above referred to were explained by the defendant. After laying the foundation, as he must have thought, for an alibi, he deliberately falsified as to his whereabouts at the time the crime was committed. The evidence shows deliberation and premeditation, and it is the deliberation and premeditation thus shown that proves the defendant's guilt. The fear expressed to Larson that something might happen to Sing Lee evidently had its origin in his own deliberate purpose to do him violence. Eliminate the evidence which shows premeditation and singles out the defendant as the slayer, and the record becomes entirely barren of facts or circumstances justifying the conviction of murder in the second degree, or of any other offense.

If, in a given case, the evidence shows conclusively that the crime committed was murder in the first degree or nothing, the court is not required to submit the lower degree. *State v. Sigg,* 86 Iowa 746, 750; *State v. Stanley,* 109 Iowa 142; *State v. Stevens,* 133 Iowa 684; *State v. King,* 117 Iowa 484, 492; *State v. Luther,* 150 Iowa 158; *State v. Burns,* 124 Iowa 207; *State v. Bertoch,* 112 Iowa 195; *State v. Thomas,* 135 Iowa 717. But is it prejudicial error to do so?

The court in *State v. Bertoch,* supra, divided equally upon the question whether the submission of murder in the second degree, in a poison case, was prejudicial, and in *State v. Cody,* 94 Iowa 169, said:

"Now, a defendant has no just grounds of complaint if the court, in such a case, shall limit the action of the jury to a conviction of the higher degree or an acquittal. But we think it cannot be said to be error prejudicial to the defendant if,

in such a case, the court should permit the jury to find as to the lower degree, if the testimony sustains the finding, which, of course, it must do to sustain a finding in the higher degree. It amounts to simply this: A defendant who has committed an offense of a higher or the highest degree charged is convicted of a lower degree, of which he is guilty. By such a course he is not prejudiced."

And in numerous cases, we have held that it does not lie in the mouth of the defendant to complain that he has been convicted of a lower degree of crime than that shown by the evidence. *State v. Haugh,* 156 Iowa 639; *State v. Cessna,* 170 Iowa 726; *State v. Whitbeck,* 145 Iowa 29; *State v. Dimmitt,* 184 Iowa 870. Murder in the first and second degrees is not distinguished as separate and distinct crimes, but as different grades of one offense. *State v. Phillips,* 118 Iowa 660. Murder in the first degree is the willful, deliberate, and premeditated killing of a human being, with malice; whereas the elements of premeditation and a specific intent to kill are not essential to constitute murder in the second degree. Both degrees, however, involve the taking of a human life, with malice. *State v. Baldes,* 133 Iowa 158; *State v. Keasling,* 74 Iowa 528.

It is possible that, if murder in the first degree alone had been submitted, the defendant would have been acquitted. Such an acquittal would, however, under the circumstances shown in evidence, have been inexcusable. No evidence was offered on behalf of the defendant tending to rebut the presumption of malice arising from the taking of human life in the manner shown, with a deadly weapon. No technicality making it possible for one accused of crime to escape punishment because the court, in the haste and confusion of a trial, made a mistake, and submitted a lower degree of the offense than that shown by the evidence, should find a place in our jurisprudence. If the court erroneously submitted murder in the second degree, the defendant could not have been prejudiced thereby.

II. If, on the other hand, the court was justified, upon 2. HOMICIDE: in- the record, in submitting murder in the second cluded offenses: submission of degree, was it error not to submit manslaughter? manslaughter without evidence. We have repeatedly held that it is not error to fail to submit an included offense of which there is no evidence.

*State v. King,* supra; *State v. Ockij,* 165 Iowa 237; *State v. Dean,* 148 Iowa 566.

As already pointed out, the physical facts shown to exist at the time the body was discovered, negative the possibility of a justifiable homicide, or a homicide committed under circumstances to sustain a conviction of manslaughter. Manslaughter is the killing of a human being without malice, and may be the result of anger, passion, or the reckless handling of a dangerous instrumentality. Sing Lee's eyes were closed. Death was probably instantaneous. In any event, there was no struggle or movement of the body sufficient to disturb the bed covering which he had tucked about his neck. There were no powder burns on the face; but one of the witnesses testified that, if the pistol were placed close enough, the powder burn would be found on the inside of the head. Just where the murderer stood, and how the weapon was held when discharged, no one definitely knows. The fact that there was no struggle or other circumstances shown to indicate a quarrel or that death was due to the accidental or careless handling of a pistol, might tend to indicate some other motive for the crime than robbery, but still a deliberately executed purpose to kill. Every circumstance, so far as shown, immediately surrounding the tragedy, negatives the idea of manslaughter. Whatever weakness, if any, may appear in the evidence of the State, goes to the question of defendant's guilt or innocence, rather than to the degree of the offense committed. To have submitted manslaughter to the jury would have invited it to enter a field of speculation without· a starting place in the evidence, and a conviction thereof could have been sustained only, if at all, upon the theory that the jury had returned a verdict for an included offense, instead of the one proven. Manslaughter is a distinct crime, and not a mere degree of a higher offense, although included therein. In the absence of evidence tending to prove the crime of manslaughter, it was not error for the court to refuse to submit the same, although submitting both degrees of murder. *State v. Brown,* 152 Iowa 427; *State v. White,* 45 Iowa 325. The above cases are decisive of the question here presented.

It therefore follows that, if the court properly submitted murder in the second degree, it was not error, under the facts

disclosed, not to submit manslaughter, and on the other hand, if the court erroneously submitted murder in the second degree, the error was not prejudicial. Upon either theory, the conviction of the defendant must stand.

Perhaps something should be said in this connection on the question of motive. Motive need not be shown. *State v. Whitbeck,* 145 Iowa 29. But the absence thereof is a circumstance to be given weight. What motive other than robbery prompted the killing of Sing Lee, we can only conjecture; but the instrument used and the circumstances revealed in the evidence leave no doubt that the act was intentional, and the consummation of a settled purpose to slay. It may have been hatred, or the hope of some advantage not revealed in the evidence. Sing Lee had been prosperous in business, and had frequently deposited with Larson sums of money varying in amount. Two canceled checks were offered in evidence, one for $4,300 and one for $500, given by Larson to the deceased, both of which bore the stamps of banks in San Francisco. This may all have been known to the defendant. Another check for $400 had not, at the time of the trial, been presented for payment. It was stipulated that Sing Lee had $4,900 on deposit in a San Francisco bank. The money found in his room after his death amounted to about $200. What other money he may have had, if any, is not shown. Apparently, a robber could have taken the change found in the cigar box on the table, and the roll of bills on the bed, if discovered. On the other hand, the murderer may, in his flight, have dropped the package, or left it for the purpose of concealing the real motive of the crime; but this, of course, is mere conjecture. It is hardly probable that deceased placed the roll of bills on the bed where it was found on the day following his death. It is much more probable that someone who knew where deceased kept his money abstracted it and dropped it on the bed. The absence of a motive for taking the life of deceased is not necessarily shown by the fact that not all of his money was taken.

3. CRIMINAL LAW: lack of motive.

III. The theory of suicide is also advanced by counsel for appellant. The bullet entered the head near the left temple, pursuing a course somewhat downward. The evidence shows

4. HOMICIDE: suicide as defense.

that Sing Lee was right-handed, and it would have been difficult, if not impossible, for him to have inflicted the injury upon himself. The medical testimony offered was to the effect that death instantaneously followed the infliction of the wound. It would have been a physical impossibility for deceased, after discharging the contents of the pistol into his left temple, to have drawn the covers over his shoulders and tucked them under his chin. Both arms were lying on his body, underneath the bed covering. There is no plausible theory upon which the claim of suicide can rest. Every reasonable inference to be drawn from the circumstances surrounding the tragedy goes to sustain the charge of murder.

IV. From what is said above, it is unnecessary to give separate consideration to appellant's contention that the verdict is not sustained by the evidence, even if it were conceded that we can, upon the record before us, review the facts for the purpose of passing upon the sufficiency thereof.

We therefore arrive at the conclusion that defendant had a' fair trial, and that no reversible error is shown; and the judgment of the court below is—*Affirmed.*

LADD, EVANS, and PRESTON, JJ., concur.

SALINGER, J. (dissenting). While I do assert that, at times, the court indulges in logical deduction from a false premise, it is not accurate to say the disagreement between us is merely a difference of opinion as to premise. Roughly stated, I am dissenting because: (1) The majority creates premises by means of usurping the functions of a jury; (2) argues from premises which the verdict returned and sustained here has destroyed; (3) because conclusions are reached from even these premises where logic demands the opposite conclusion; (4) because the majority enters into review *de novo,* where it should limit itself to such appellate review as governs in the review of verdicts; (5) because the majority opinion disregards the reasonable doubt statute and the decisions in this court which give that statute effect; (6) because decisions relied on to support the majority militate against its holding; and (7) because the single decision in this court which does support the majority is in itself not sup-

ported by the support such decision claims, is contrary to the great weight of authority here and elsewhere, and is, if it be assumed to be well decided, inapplicable here.   These grounds for dissent logically divide into two main heads:   (1) The negative argument that the affirmance is badly supported, even if there be sound reasons for affirming; (2) the affirmative argument that the conclusions reached by the court are, in fact, unsound, and that the record and the law demand a reversal.   I shall deal with the negative argument first, and do so fully realizing that, though a decision be badly reasoned or ineffectively supported, it may yet be a correct decision,—another way of saying that one may concur in a result, and make no objection save that the method of reaching the result should not be spread in a decision which will be used as a precedent.   It is not amiss to add that a negative argument may sometimes support an affirmative attack.   That is to say, if the reasons advanced in support of a decision seem to exhaust the field, seem to make all the argument that can be made in support, and yet are each and all untenable, this will be some evidence that sound reasoning prohibits the conclusion arrived at.   With these preliminaries stated, I proceed to exhaust what I have termed the negative argument.

I.   The trial court refused to instruct that the verdict must be either murder in the first degree or acquittal.   It also refused to submit manslaughter.   Appellant complains of both refusals.   The majority sustains both refusals.   I concur in sustaining the one refusal, but am of opinion it was error not to submit manslaughter.   My concurrence is not based on any reason advanced by the majority, because I hold that the reasons which it does advance are reasons against its conclusion. The majority sustains the submission of murder in the second degree on the ground that the evidence of malice aforethought and premeditation *is* conclusive.   I agree that it was right to submit degrees below the first, but do so on the ground that the evidence of malice aforethought and premeditation is *not* conclusive, and contend that that is the true reason, and that the reason advanced by the majority is a reason for reversing, instead of affirming.   Cases of which *State v. Bertoch,* 112 Iowa 195, is typical hold that if, under the evidence, the verdict should

be either murder in the first degree or acquittal, it is error to·
submit *any* lower degree. A long line of decisions which begin
with *State v. Mahan*, 68 Iowa 304, 307, 308, which includes
*State v. Brooks*, 181 Iowa 874, at 880, and of which, at this writ-
ing, *State v. Dimmitt*, 184 Iowa 870, is the last, rule that it is
not error to submit lower degrees unless it can be said, as matter
of law, that the evidence of malice aforethought and premedita-
tion is conclusive. The majority does not disturb any of these
decisions. As said, they hold that the conclusive evidence of
murder in the first degree is a reason for reversing because a
lower degree was submitted. The court finds the evidence to be
in that state, and then proceeds to do the opposite of what these
cases and this state of the evidence demand. But despite the un-
sound reason assigned for it, the court below should be sus-
tained in having submitted murder in the second degree. Now,
in sustaining the refusal to submit manslaughter, the majority
is scarcely consistent. Having held that murder in the second
degree should be submitted, despite the fact that the evidence
of murder in the first degree is conclusive, it should hold that
such conclusiveness is no bar to submitting manslaughter, which
is as much a degree of homicide as is murder in the second de-
gree. *Gordon v. State*, 3 Iowa 410. (But of this more in an-
other connection.) Once hold that, though the evidence of the
first degree be conclusive, it is proper to submit *any* lower degree,
and it follows that *all* degrees of homicide must be submitted.
If, on the other hand, the court is mistaken in holding that the
evidence of malice and premeditation is conclusive, that weak-
ness demands the submission of one lower degree precisely as
much as it does the submission of any other. Logic may demand
either that no lower or all lower degrees of homicide be sub-
mitted. But logic affords no halfway house, and in no state of
the evidence is it justified to sustain the submission of murder
in the second degree and also the refusal to submit manslaughter.
There is one declaration in the opinion which seems to challenge
this self-evident proposition, and that statement is a most re-
markable illustration of how far one may be driven when he once
departs from true logic. That declaration is that, whenever
submission of second degree *is* justified, *that fact alone* proves
that the submission of manslaughter is *not* justified. Conceivably,

there might be a case wherein submitting second degree was, and submitting manslaughter was not, justified. But how can the naked fact that submitting the second degree is justified of itself prove that manslaughter ought not to be submitted?

II. I repeat that, on the reasoning upon which the court sustains the submission of murder in the second degree, it is illogical also to sustain the declination to submit manslaughter. But I concede also that, notwithstanding this flaw in consistency, the majority is right in holding it was proper not to submit manslaughter, provided one reason assigned by it for so holding is an available premise. While its holding that proof of premeditation and malice aforethought is a reason for submitting murder in the second degree is unsound, conclusive evidence of malice aforethought and premeditation *is* a sound reason for excluding manslaughter. Manslaughter being unlawful killing without malice, it necessarily follows that, if the evidence of malice aforethought is conclusive, a homicide cannot have been manslaughter.

The major argument of the majority is: (1) That it would have been a travesty to submit manslaughter, because the evidence of premeditation and malice aforethought is conclusive; and (2) that the physical facts demonstrate manslaughter to be impossible. If that be a warranted assertion, there is an end, and the majority is right. At this point, then, the negative argument against the opinion forces the question of what right the majority has to create this premise.

It is true that, if the evidence of malice aforethought and premeditation *be* conclusive, there is no room to find manslaughter. But where did the majority get the right to hold that such is the state of the evidence? The appellant is not presenting any such question, for the verdict of murder in the second degree has acquitted him of such malice and of premeditation. The State does not assert that the evidence on these heads is conclusive. On the contrary, the argument in its behalf insists in the most emphatic way that the evidence is such as that the trial court would have erred if it had limited the verdict to murder in the first degree. To begin with, then, the considering premeditation at all is arbitrary. Passing that, where does the majority get the right to decide that the evidence of premeditation is conclusive,—the right to depart from the settled

rules of appellate review, and to pass *de novo* upon a finding made by the jury? Whence comes the right to make a finding on malice and on premeditation, where such question is not presented for decision? Whence the right to invade the province of the jury by making a fact finding, and one which is contrary to that made by the jury? In the first instance at least, it is for the jury to say whether evidence proves or fails to prove *any* fact, conclusively (*Stilwell v. Stilwell,* 186 Iowa 177, *Turner v. Hartford Fire Ins. Co.,* 185 Iowa 1363), and it is for the jury, and not for the Supreme Court, to determine what degree of murder is proved. *State v. O'Donnell,* 176 Iowa 337. Ordinarily, at least, a verdict of murder in the second degree is a conclusive adjudication that both malice aforethought and premeditation are wanting. *State v. Perigo,* 80 Iowa 37, at 44; *State v. Row,* 81 Iowa 138, at 153; *State v. Peters,* 56 Iowa 263; *State v. Barkley,* 129 Iowa 484; *State v. Brooks,* 181 Iowa 874, at 882. There is but one rightful way in which to obtain premeditation as the basis for *any* argument, and that is by means of a rightful finding by this court that the verdict is purely captious. The majority recognizes this to be so, and therefore asserts that the verdict *is* captious, is an undue act of mercy, and is against conclusive evidence of premeditation and malice aforethought. But does the record sustain such an assertion? Instead of doing that, it leaves no reasonable doubt that the verdict is binding because it is *not* captious; because, beyond all reasonable question, the evidence is such as that the jury was fully within its rights in finding either that there was or that there was not premeditation and malice aforethought. If that be so, this court has no right to disregard the verdict, and therefore no right to argue from the existence of premeditation and malice aforethought as a premise.

The three main heads upon which the argument of the majority proceeds in asserting captiousness are: (1) The verdict is captious because, if there was no premeditation, then there was no justification for finding guilt at all; (2) it is conclusively shown defendant falsely asserted Sing was sick, in order to make the subsequent death appear to be a suicide; and (3) is captious because defendant manufactured an alibi.

a. The verdict is not captious on the first ground. There

was such evidence of admissions and of conduct subsequent to the death of Sing as that a jury could, without being captious, find that, though the killing was not done on premeditation and with malice aforethought, yet it was done by the defendant.

b. It is not conclusively shown that defendant falsely pretended to believe that Sing was sick, and the jury could find that he believed what he said to be true. While witnesses say they never heard Sing make general complaints, or never heard him cough, and the like, it appears, on the other hand, that the working habits of Sing would tend to make him sick, and that, for 17 years, his sleeping room was without ventilation and without sunlight. Moreover, there is positive testimony that Sing himself declared, "Me no good, me sick, me no good any more;" that he said, in the fall of 1914 or 1915, he "wasn't any good any more for a month or so;" and that he "was poorly, and laid off three weeks or a month." Manifestly, the jury was not captious if it found that the declarations of defendant as to the sickness of Sing were honestly made, and did not tend to show premeditation.

c. Another reason why there is no right to hold the verdict was captious is that evidence tending to prove acts relied upon to show premeditation is either in such state as to leave it an open question as to whether the acts occurred before or after the homicide, or else make plain that they were done afterwards. (Lyle, Calkins, Mrs. Black, Alpin, Smith, Lough, and Miller). Manifestly, a jury was not captious in declining to treat acts *after* the homicide as showing premeditation to commit it.

### 2-a

There is much testimony which tends to show that some Chinaman was about Nevada and Ames before the commission of the homicide, at a time when defendant claimed to have been in Chicago. In fewer words, if the Chinaman thus seen was the defendant, there is evidence of premeditation, because evidence of an attempt to manufacture a false alibi. But, manifestly, all this can be no evidence of premeditation if the jury could, in reason, find it was not shown beyond a reasonable doubt that the defendant was the man seen. To be sure, the majority becomes

a jury at this point, and finds for itself that defendant was the man, and that, therefore, the evidence of premeditation is conclusive, and does exclude manslaughter. It is not the province of the court to make this finding. The sole question is whether the jury was captious in finding that defendant was not the man seen. It does not matter what the members of this court think on this point. The vital question is what the jury had the right to think. If it could reasonably have a doubt as to the identification, then its refusal to find premeditation may not be disturbed here. I assert with all confidence that no reasonable mind can find that the jury had no right to hold against the sufficiency of the identification. A careful analysis of the testimony shows this:

a. Some of the witnesses disclose that there was nothing about the man seen to impress his identity upon them. For instance, they are not fortified because the sight of a Chinaman was a rarity, for they say they had frequently seen Chinamen. Others declare squarely that they know of no peculiarity other than such as is common to all Chinamen. Among these are Mrs. Smith, Mrs. Black, and Miss Calkins. Others say that to them all Chinamen have the like general appearance. Among these are Alpin and Smith.

b. Another class is simply arbitrary, and declines to give any foundation for the identification except some such answer as "Oh, I just remember" (Simpson). Mrs. Smith was asked to close her eyes and describe the man she had seen in the past, and answered, "I don't remember how he looked at that time;" and yet insisted that defendant was the man seen by her. Miss Calkins, after struggling to give reasons for remembering, finally placed herself upon the claim that she knew the man because "I just suppose by a sort of instinct." Elliott said, "I had a conclusion in my mind that he was the one;" and Darling, "He was supposed to be the same fellow."

c. The conductor who positively identifies the defendant admitted having said, at an earlier time, that all he could say was that the man might resemble the man on trial. He explained having changed his mind because, while he had time to sit down and talk about it, he was very busy when he said this; that he made this statement merely because he had no time to go into

any details about it, although, he said, he sat down for several minutes and talked about it. His change of mind is finally explained by saying that he said what he did "so as not to get started on any details; I was busy."

d. One class is typified by the statement of Mrs. Armstrong: "I couldn't and wouldn't say for sure that defendant is the man I saw." To like effect is the testimony of Miller and of Downey.

e. Others who identify the defendant admit that they had seen people and at first supposed them to be friends, to learn, on a little closer approach, that they were in error (Black, Elliott, Smith, and Lough).

f. Those who had special occasion to remember, because they saw the man for quite a little time, and when he acted peculiarly, declare that they will not and cannot say that defendant is the man (Mrs. Pulus). Lyle, who delivered a special delivery letter to the Chinaman seen in Story County before the murder,—a link greatly relied on to prove spurious alibi,—says positively that defendant is not the man to whom he handed the letter, and points out sharp differences in the appearance of the two; and Miller says the man seen by him did not seem to be the defendant, and that he thought the man whom he had seen was younger and taller than defendant.

g. One witness saw the man while the latter was walking a rod or two on a dark platform, and saw him afterwards for a moment in an unlighted vestibule. The conductor who saw the man for just a moment in a dark vestibule has so retentive a memory that he is unable to give the number of the house in which he resides. Still another had defective eyesight.

h. Many of the witnesses had their attention attracted by peculiarity in overgarments, hat gear, and a smooth-shaven face. These and the other witnesses did not see the defendant until about a year after seeing the Chinaman about the county, and saw defendant either in jail or at his trial, where he was without the garments and hat that attracted attention, and wore a mustache and beard.

i. There was every imaginable discrepancy on the height and weight of the man seen. Miss Calkins places him at less than 5 feet high, though more than 4 feet 6, and says he was some-

thing like 4 feet 8, and Smith supposes he was about 4 feet 6, or somewhere along there. On the other hand, Thompson testifies that he himself is 5 feet 9, and that the man seen was nearly that tall; and Black, that he was probably 5 feet 6 or 5 feet 8. According to Mrs. Smith, he weighed about 170 pounds. According to Mrs. Armstrong, he was heavy; but O'Donnell testified he weighed but from 140 to 145 pounds.

j. It must be taken into consideration, too, that the jury saw the defendant, and had the right to find that he so differed from the descriptions given as that he was not the man whom the witnesses had seen before the murder.

These weaknesses in the testimony on identification are not, as the majority seems to conceive, nothing but a means of raising doubt as to whether there was guilt at all. If this evidence be weak and doubtful, it justified the jury in finding, as it did, that there was no premeditation, because it was doubtful whether the acts tending to show premeditation were done by the defendant.

What it all comes to is that, though the presence of malice aforethought and premeditation would justify refusal to submit manslaughter, the majority has no right to use such a premise, because the verdict of the jury has destroyed the premise.

### 2-b

The conditions under which a homicide may be manslaughter are thoroughly well settled in the law. Manslaughter may be done by an accidental killing on part of one engaged in some unlawful act; or by one thus engaged who acts without malice, though he inflict the injury intentionally (*State v. Abarr*, 39 Iowa 185); or by the careless and negligent use of a dangerous weapon (*State v. Warner*, 157 Iowa 111, *State v. Hardie*, 47 Iowa 647); by accidentally pointing a weapon into the range, and then firing the same off recklessly or heedlessly (*State v. Vance*, 17 Iowa 138); and by a killing on sudden quarrel or in passion. Whence comes the right of the majority to declare that it was right not to submit manslaughter because the killing could not have been done under any of the conditions which the law makes manslaughter? Grant it is conclusively shown that the lethal wounds were not self-inflicted. Grant, for the sake of

argument, that no powder marks were observed. But how does that establish that manslaughter is an impossibility? Surely, deaths not due to suicide have been effected by manslaughter. The absence of powder marks shows that the assailant was not close to his victim. But may not manslaughter be done by a shot fired at a distance sufficient to prevent powder marks? The jury could doubt whether the revolver found at the bedside was shown to be the property of the defendant. If it was his property, it could find a failure to prove that it was used, because, while the size of the revolver is shown, there is no evidence of the sized bullet that made the wounds. But suppose defendant did own and use the revolver. Has not often manslaughter been done when it was conceded that the assailant used his own weapon? The main argument for declaring that manslaughter must be found to be an impossibility is that witnesses found Sing lying in such fashion as to exclude the idea that there had been any struggle. But the testimony does not exclude that others may have been in the room before the witnesses who testified to the position of the decedent. Be that as it may, what authorizes the majority to say that there may not have been a quarrel, a deadly shot without a struggle, and that thereafter the slayer placed Sing upon his bed and composed him into the position the witnesses speak to? We said, in *State v. Rankin,* 150 Iowa 701, at 706, that manslaughter was not necessarily excluded, because defendant might have taken the child found dead ''from the foot of the bed * * * and put it in the pillow slip, or have placed it in the corner of the room, or even have carried it from the room without killing it;'' and that, while we will not say that any of these things were probable, that yet they were possible.

In one word, it is my opinion that the physical facts do not exclude manslaughter from the fair consideration of a jury.

. 2-c

Nothing short of the right to find that the evidence of malice aforethought and premeditation is conclusive will support the majority opinion. Manslaughter should not be excluded, even if the jury is warranted in finding that a higher offense was committed. In many of our decisions, the submission of man-

slaughter has been sustained although the evidence of a higher degree was exceedingly strong. Their great number makes their extended citation impracticable. It must suffice to say that, in *State v. Adams,* 155 Iowa 660, at 662, *State v. Murdy,* 81 Iowa 603, and *State v. Penney,* 113 Iowa 691, and in which manslaughter was held to have been rightfully submitted, the evidence tending to prove murder in the higher degrees was much more persuasive than that found in this record. This is most emphatically true of *State v. Hessenius,* 165 Iowa 415, 420. In that case, there was every reason for believing that the defendant gave a false account of the cause of the death, and had himself brutally strangled his victim. The only warrant for submitting manslaughter in that case must have been that it was merely "possible" that the offense was that.

### 2-d

The majority stresses a class of cases as affording support of conclusions. But these hold absolutely nothing beyond the conceded rule that, whenever the evidence of a higher offense is conclusive, it is not error to refuse the submission of *some* lower included offenses. The cases so stressed are *State v. King,* 117 Iowa 484, at 492; *State v. Dean,* 148 Iowa 566; and *State v. Ockij,* 165 Iowa 237. And there is another class which is usually relied on for sustaining the exclusion of lower included offenses. I shall presently attempt to show that this class fails, not only to furnish support to the majority, but is against its conclusions. The cases in this class proceed on a sound theory which the majority disavows: to wit, that manslaughter is a degree of homicide—a proposition that no one should dispute. As early as *Gordon v. State,* 3 Iowa 410, at 412, we said that, while homicide is the genus of murder, manslaughter is a species. And over and again have we held that, under our statutes, all criminal homicides are classed into the three grades of offenses known as murder in the first, murder in the second degree, and manslaughter. As was said in *Commonwealth v. Webster,* 59 Mass. 295, 307, the true definition of manslaughter is that it is homicide mitigated, out of tenderness for the frailty of human nature. The cases I speak of start with the premise that manslaughter *is* a degree of homicide. In each of them, manslaughter

was submitted, and as matter of course. And as to the exclusion of lower included offenses, they merely hold that, whenever it appears that death has resulted, it is not required to submit, say, assault and battery or simple assault. There are some 16 of these cases. They begin with *State v. Tweedy*, 11 Iowa 350, at 353, and are very frequent at least as late as *State v. Nott*, 168 Iowa 617. Their real holding is made clear, among other cases, in *State v. Cunningham*, 111 Iowa 233, 245; *State v. Sterrett*, 80 Iowa 609, 612; *State v. Bone*, 114 Iowa 537, at 545; and *State v. Klute*, 160 Iowa 170, at 183. The *Bone* case is most illustrative. It was therein said that:

"There was no error in failure to refer to assaults. If defendant was guilty of any crime, it was either murder or manslaughter."

They are no authority for excluding manslaughter, because, as said, each of them submitted manslaughter as matter of course. The most that can be made of them for the majority is that, where homicide is proved, it is not required to submit any included offense below manslaughter. These cases cannot be strained into a precedent that, though the weakness of the evidence compels the submission of the second degree, that yet, when there is reasonable doubt as to whether murder in the second degree was done, that doubt will not compel the submitting of manslaughter. They are, in effect, precedents which adopt *State v. Decklotts*, 19 Iowa 447, a case which declares with emphasis that it is almost impossible to define "the boundaries between murder and manslaughter;" almost impossible to do this "even if the testimony be not in conflict."

2-e

So far as language goes, there is one case, and just one, decided by this court which supports the majority. It is *State v. Brown*, 152 Iowa 427, at 437, 438. It repeats and affirms an erroneous statement made in *State v. White*, 45 Iowa 325, to the effect that manslaughter is not a degree of murder, but is a distinct offense. I say emphatically that the *White* case had no occasion to speak to such a point, and decided nothing except that such a crime as assault with intent to commit manslaughter existed. I think I have shown that, aside from being pure

dictum, it is overwhelmingly settled against the dictum that manslaughter *is* a degree of murder, and any argument based upon the contrary view is necessarily fallacious. Passing now that *State v. Brown* starts with this erroneous theory of law, it is said in that case:

"This court is committed to the doctrine that it is not error to omit to submit whether the accused is guilty of manslaughter when there is no testimony tending to reduce the offense, if any there was, below the grade of murder."

I shall presently attempt to show that this is an affirmative error; but for the present, I shall pursue the negative argument. The *Brown* case is not only erroneous because it proceeds on the basis that manslaughter is a distinct offense, but it is also erroneous in its claim that this court is committed to any such doctrine as it asserts. The only Iowa case which it cites in its own support is *State v. Cater,* 100 Iowa 501. That case does not, in terms at least, deal with the submission of manslaughter, and affirms nothing except the conceded general rule that no lower degree should be submitted when the facts show defendant is either guilty of the crime charged or not guilty. The *Cater* case may be an argument for reversing because the trial court submitted anything lower than murder in the first degree,—and we are declining to reverse on that ground,—but it is not argument for a refusal to submit manslaughter. Very great research has failed to find any Iowa case other than *State v. Brown* which holds that manslaughter need not be submitted where the evidence demands the submission of murder in the second degree. I think, too, that *State v. Johnson,* 162 Iowa 597, by construction of the *Brown* case, so limits the same as that it is put in the same class with *State v. Moore,* 129 Iowa 514, at 517, wherein it is ruled that while, if it does not appear the homicide was justified, a presumption of fact against manslaughter is raised, that yet, if there be a failure to prove malice, a conviction for manslaughter is justified. Be that as it may, I contend the *Brown* case has no support in our own decisions. It is, however, true that a divided court in *Sparf v. United States,* 156 U. S. 51 (15 Sup. Ct. Rep. 273), and *Davis v. United States,* 165 U. S. 373 (17 Sup. Ct. Rep. 360), and *State v. Nelson,* 91 Minn. 143 (97 N. W. 652), do support

*Brown's* case, in the sense that they do sustain the refusal to submit manslaughter because the state of the evidence does not justify its submission. But their so holding fails, after all, to support *State v. Brown,* because these holdings were not made under a reasonable doubt statute, such as we have, nor in the face of cases construing such a statute as this court has very many times construed the same.

To why *Brown's* case does not control, even if it were well decided, I speak later.

I conclude that the ''negative arguments'' demonstrate that the conclusion of the majority has no support.

### Division 2.

I. This brings us to the question whether it cannot be made to appear affirmatively that its decision is erroneous. It would seem, in the last analysis, to be the position of the majority that, if the State fails to put in affirmative testimony tending to prove manslaughter, defendant cannot demand the submission of that degree of homicide unless he himself puts in affirmative evidence tending to show he is guilty. It would seem to follow that the court has proceeded to amend the statute, as well as to disregard the decisions which affirm the statute as written. Section 5377 of the Code of 1897 provides that, if there be reasonable doubt of the degree of which the defendant is *proven* to be guilty, he shall be convicted of the lower degree only. Since, as early as 4 Coke 47, there was formulated the maxim that, if a thing be not proved, it does not exist, it would seem to be the plain meaning of the statute that a lower degree must be submitted, not because there is affirmative evidence of it, but because there is reason to doubt whether the higher is established by the proof. The court is amending the statute under which reasonable doubt of the proof of the higher submits the lower, by adding to the statute that reasonable doubt as to the evidence of a higher demands the submission of a lower degree, provided, in addition to this doubt, there be affirmative evidence tending to establish the lower degree.

Decisions too numerous to cite affirm the general proposition that *weakness* or absence in the proof of the next higher, *alone,* forces the submission of the lower. One is as good as a

hundred. See *State v. Bertoch,* 112 Iowa 195, at 201. We so held in *State v. Smith,* 192 Iowa —. A multitude of decisions declare that murder in the second degree must be submitted, not because there is affirmative evidence of that degree, but because there may be a reasonable doubt as to the sufficiency of the evidence to prove murder in the first degree. Such decisions are mere obedience to the statute. They begin with *Fouts v. State,* 4 G. Greene 500; they include *State v. Moore,* 129 Iowa 514, 517; and are frequent as late as *State v. O'Donnell,* 176 Iowa 337. For that matter, nothing can be more emphatic than the concessions in the argument for the State. It declares that in no possible case of circumstantial evidence can the court refuse to submit murder in the second degree; that, in such a case, it is almost inconceivable to have evidence that makes it so impossible that anything but murder in the first degree was done as to justify the court in refusing to submit the second degree. If, under the statute and the decisions, it needs no affirmative evidence of second degree murder to entitle the defendant to go to the jury upon it, if a reasonable doubt as to the sufficiency of the evidence of the higher degree of itself demands the submission of the second degree, I am unable to understand why like doubt, as between murder in the second degree and manslaughter, is not sufficient to demand the submission of manslaughter, unless, to the reasonable doubt of murder in the second degree, there is added some affirmative evidence that the crime was manslaughter.

As I view it, we have, in effect, squarely held that the rule as between murder in the first and murder in the second degree is, as well, the rule between murder in the second degree and manslaughter. In *State v. Perigo,* 80 Iowa 37, at 44, we said:

"There are so many phases of the testimony to justify that result [to acquit of murder in the second degree], and the verdict returned, that it would have been a grave error not to have instructed as to manslaughter."

And:

"It is enough to say on this proposition that it was possible for the jury, after considering all the testimony, to have a reasonable doubt as to defendant's guilt of murder in the second degree; and, in that case, it was their duty, as instructed, to

acquit him of that charge, and then to decide as to his guilt of manslaughter.''

We said in *State v. Shepherd*, 129 Iowa 705, at 708:

''Whatever may be said as to the proper course to be pursued in a case where murder is charged to have been committed by means of poison, we think it must be said, where the charge is of murder by lying in wait, or other willful, deliberate, or premeditated killing, the rule is that the case must go to the jury, to find the guilt of the defendant and the degree thereof, if murder, or of the included offense, if less than murder. In other words, the law recognizes the possibility that, in all such cases, the offense may be less than murder, and that the jury should be privileged to so find.''

One reason advanced for this holding was that:

''Just how and just why the deed was committed was open to more than one reasonable conclusion, in view of all the facts and circumstances presented. Accordingly, the court could not say that, if a conviction was to be had, it should not be for an offense less than murder.''

There is not a suggestion in either of these cases that affirmative evidence of manslaughter is needed. Manifestly, both proceed on the theory that, if it be possible to be in doubt as to whether the higher degree of homicide has been established, that fact, without more, demands that manslaughter must be submitted.

II. In addition to cases which hold that reasonable doubt, without more, requires the submission of manslaughter, there is a line of cases which, unless there be some sound avoidance of them, settle that manslaughter must be submitted if, in a circumstantial evidence case, it is ''possible,'' as distinguished from being probable, that the offense may have been manslaughter. This has been held where an infant had been slain— a case in which there is the least probability that the elements of manslaughter were present. In *State v. Cunningham*, 111 Iowa 233, at 245, we said:

''The act of killing was witnessed by no person. Whether it was premeditated and deliberate, or done in a moment of desperation or passion, is a matter of inference only. In such a case, we think it is wise to do as the trial court did here, sub-

mit every grade of offense which would be warranted under the facts which might fairly be found."

In *State v. Rankin,* 150 Iowa 701, at 706, we said:

"There was no direct evidence of violence to the child necessarily sufficient to cause death. Defendant might have taken it from the foot of the bed, or have wrapped it with clothes and put it in the pillow slip, or have placed it in the corner of the room, or even have carried it from the room without killing it."

In certain contingencies, there was room to find "that, though defendant had seized the child with unlawful intent, he may not have terminated his life. *We are not saying that this is probable, but that it was possible, and for this reason the court rightly submitted to the jury whether defendant by his own act took the life of the infant,* and, if not, whether he merely laid hands on it unlawfully, thereby committing one of the offenses included in the indictment."

In each of these cases, complaint was made here because the court had submitted manslaughter. Therefore, the court was called upon squarely to decide whether the record justified the submission of manslaughter, and its holding that the submission was not error was, therefore, no dictum. Nor is the pronouncement in *State v. Perigo,* 80 Iowa 37, at 44, a dictum. In other words, if the court had found that the evidence did not justify the submission of manslaughter, it might have held that submitting it was prejudicial, because it distracted the attention of the jury from the matters that were rightly for its investigation.

These cases rule that manslaughter must be submitted if its existence be merely possible, as distinguished from being probable. If they may be avoided, it must be because in them the question was whether it was error to have submitted manslaughter, while here it is whether it was error to have refused submitting manslaughter. I submit that this difference is an immaterial one, because this court does not stop with determining between the parties, and because its most important function is the making of precedents for future guidance. To the function of precedent making, the reasons for a decision are more vital than the decision itself. Were we to hold that a reason assigned by us for affirming the submission of manslaughter is

irrelevant on whether to reverse for refusing to submit manslaughter, it would make precedent law farcical—would be to adopt the legendary "quarter section" differentiation, with a vengeance. When we rule against an objection which complains that manslaughter was submitted, and assign a reason for such ruling, we of needs settle that, in the stated circumstances, manslaughter should be submitted. Can it be possible that this is not a precedent which compels us to reverse because the court refused to submit manslaughter in the very. circumstances wherein we had held the submission could not be complained of? Can it be possible that, where we hold it was right to submit manslaughter because there was doubt as to the higher degree, it forms no precedent that it is error to refuse the submission of manslaughter where the same doubt is found present? To carry this to its logical end, when we sustain the giving of an instruction for a stated reason on a stated record, this would not settle that it is error to refuse the like instruction, on the same state of the record. We constantly use a decision which approves the giving of an instruction in stated circumstances, as a precedent for holding it to be error to refuse the like instruction in like circumstances. Any other. practice would be in disregard of the self-evident proposition that an affirmance may be as binding a precedent on a given proposition as is a reversal on the same proposition. Surely, the mere vehicle of pronouncement cannot be vital.

III. Whatever is evidence sending murder in the second degree to a jury is almost, of necessity, evidence upon which manslaughter can be found. In *State v. Decklotts,* 19 Iowa 447, at 455, Mr. Justice Dillon said:

"It is not a little difficult, frequently, even where the testimony is not conflicting, to determine what shall be considered murder or manslaughter. * * * The boundaries between murder and manslaughter cannot always be distinctly ascertained and traced. The rules of law are plain, but their application difficult."

Cases such as *State v. Perigo,* 80 Iowa 37, at 44, and the *Cunningham* case and the *Rankin* case and *State v. Shepherd,* while they declare specific rules, also involve recognition of the fact that inherently evidence of either is evidence of both. They

recognize, as to the boundary line between murder in the second degree and manslaughter, what the attorney general concedes and urges with reference to excluding murder in the second degree. They hold, in effect, that it is almost impossible to imagine a case where the evidence justifies submitting murder in the second degree and also justifies the refusal to submit manslaughter.

IV. I have elsewhere given my reasons for contending that *State v. Brown* should not be followed. But assume that that case is well decided; assume that manslaughter need not be submitted unless there be some evidence upon which it can be, in reason, found that manslaughter was committed. And yet all these concessions do not control this case, because neither the *Brown* case nor its support pretend to define what shall be deemed to be such affirmative evidence. On the contrary, *Brown's* case but holds that speculation as to what may have happened is not to be permitted, where "the record is void of any evidence, circumstantial or otherwise, even tending to indicate that the killing was otherwise than intended and premeditated." There is not an intimation as to what circumstances or fact inferences may constitute the affirmative evidence that forces the submission of manslaughter. For instance, it is not said that, if the jury may find there is no motive, that such fact does not afford a basis upon which the jury may find that malice was absent, and therefore that, though homicide was committed, it was manslaughter. And I shall presently attempt to show that absence of motive should be treated as "affirmative evidence" of want of malice. Of course, one may be found guilty, "even if no motive has been proved." *State v. Bone,* 114 Iowa 537, at 544; *State v. Whitbeck,* 145 Iowa 29; *State v. Saling,* 177 Iowa 552, at 561. But that is beside the mark. The question here is not whether the State has failed to prove a case because it has failed to prove a motive. It is whether absence of motive is any evidence of lack of malice. Under the evidence, others had as much motive as defendant can possibly have had; and as to him it appears affirmatively that he had none. The relations between him and Sing were friendly. Defendant had nothing to gain by Sing's death, and no reason to believe he could gain anything by it. I have no quarrel with the state-

ment of the majority that, despite this state of the evidence, the jury might have found an adequate motive. In turn, it ought to be conceded the jury could find defendant had no motive, and I address myself to what should be held, where a jury could find either that there was or that there was not a motive; to whether there is not a jury question as to manslaughter, where either presence or absence of motive can be found. The very cases that rule that failure to prove motive does not necessarily demand an acquittal hold that its absence is ''a strong argument for the defense.'' *State v. Saling,* 177 Iowa 552, at 561. In *State v. Whitbeck,* 145 Iowa 29, at 43, it is held that, while there may be a conviction though no motive is shown, the absence of motive may justify the jury in finding that defendant is not guilty. In logic, it is inevitable that the absence of motive may, as well, convince that there was no malice. In *State v. Peffers,* 80 Iowa 580, we clearly recognize that the absence of motive may require a submission of manslaughter, because we hold that, though the evidence of a motive to injure deceased and of premeditation is not strong, it was enough to sustain a verdict of manslaughter.

If affirmative evidence be necessary to justify the submission of manslaughter, the fact that a jury may reasonably find there was no motive urging defendant to kill is, at least in a case of purely circumstantial evidence, such ''affirmative evidence.'' In such case, all the findings rest on so-called presumptions, and upon inferences that create fact arguments. When, in such case, a jury finds, or may find, there was no motive, this justifies a finding that there was no malice. Such inference is justified; because, according to common experience, all homicides prompted by malice usually are prompted by a motive. It is so much common knowledge that motive is wanting only in homicides caused by recklessness or heat of blood as that an apparent lack of motive is, as seen, considered evidence that the one who lacked the motive did not kill. This is so much matter of common experience and knowledge as that the absence of such motive would be evidence to sustain a claim of mental irresponsibility. In one word, if the jury could find there was no motive, it could find that, though defendant did the killing, he was not actuated by malice. The inability to find motive is

"affirmative evidence" from which absence of malice can be deduced. And, as said in *Stevenson v. United States,* 162 U. S. 313 (16 Sup. Ct. Rep. 839), if there be any evidence that malice is absent, an instruction submitting manslaughter is demanded. In effect, we have held as much; for it is ruled, in *State v. Moore,* 129 Iowa 514, at 517, that, if it does not appear the homicide was justified or committed on lawful excuse, then, if proof of malice also fails, there may be a conviction of manslaughter.

The state of the record as to motive was alone sufficient to require the submission of manslaughter.

If a case be conceivable in which it would be justifiable arbitrarily to tear elementary law from its deep-laid foundations, it should be done in aid of liberty. If conceivably there may be a case which would justify the straining of elementary and salutary law, it should not be a strain in aid of keeping a human being in a felon's cell for life.

I am authorized to say that Weaver, C. J., concurs in this dissent.